NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

The BALTIMORE LUGGAGE COMPANY, Respondent.

International Leather Goods, Plastics & Novelty Workers' Union, AFL–CIO, Intervenor.

No. 11227.

United States Court of Appeals Fourth Circuit.

Argued Oct. 4, 1967.

Decided Dec. 6, 1967.

Nancy M. Sherman, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Burton L. Raimi, Atty., National Labor Relations Board, on brief), for petitioner.

Charles Yumkas, Baltimore, Md. (Jacob Blum, Baltimore, Md. on brief), for respondent.

Max H. Frankle, New York City (Bernard Yaker and Vladeck, Elias, Frankle, Vladeck & Lewis, New York City, on brief), for intervenor.

Before SOBELOFF, BOREMAN and CRAVEN, Circuit Judges.

SOBELOFF, Circuit Judge:

After the production and maintenance employees of the Baltimore Luggage Company voted overwhelmingly (96–46) in favor of designating the Intertional Leather Goods, Plastic & Novelty Workers Union, AFL–CIO, as their exclusive bargaining agent, the National Labor Relations Board so certified the Union. Baltimore Luggage, however, has refused to bargain with the Union because of certain racially-oriented appeals which the Company contends deprived the employees of their right to a free and untrammelled election. Agreeing with the Board that the Company's refusal to bargain violated § 8(a) (5) of the Labor Act, we enforce the Board's order requiring the employer to bargain in good faith with the employees' properly elected representative.

Of the 144 eligible voters employed by the respondent Company, a manufacturer and distributor of luggage, 134 are Negro. To these workers certain appeals endorsing the Union were made by representatives of the National Association for the Advancement of Colored People. The Company's objections to the validity of the election are premised upon these expressions of opinion, contained in a letter and two speeches.

The letter, written under an NAACP letterhead by Dr. Lillie M. Jackson, President of the Baltimore Branch of the NAACP, urged support for the Union. In explaining the NAACP's advocacy of unionization, Dr. Jackson said, in part:

"Our sympathies are with the labor movement because they have demonstrated that they are our friends and have helped us in our civil rights struggles. They have marched with us in Washington and from Selma to Montgomery.

The wife of a Union official gave her life in our cause.

We believe the only way the workers of Baltimore Luggage can improve their lot is through organization. It is a simple fact that colored workers who belong to unions are far better off than those who don't."

Asserting that freedom, civil rights and economic opportunity are inextricably bound together, she noted the many benefits—including higher wages, better conditions and job security—which unions have secured for their members. Dr. Jackson also observed that the technique of united action was common to both the civil rights and labor movements.

The disputed extemporaneous speeches, reconstructed from the memories of the speakers and several listeners, were delivered by Rev. Marion Bascomb, pastor of a local church and a member of the

executive council of the Baltimore branch of the NAACP, and St. George Cross, another NAACP representative. The thrust of each speech was that economic opportunity and personal dignity could be achieved through unionization.

Stressing the impact that united action can have on the employees standard of living, Rev. Bascomb devoted most of his talk to homey analogies such as a match which when alone is easily broken, but which is much harder to break when combined with other matches. To prove this same point, he cited a boycott initiated by a Ministers' Alliance which resulted in a local bakery's hiring a few Negro drivers and beginning to address colored male employees as "Mr." instead of "boys."

The improvement in personal dignity, clearly implied in the bakery incident, was more vividly described by Rev. Bascomb in a short vignette from his childhood. He recalled that as a boy in the Deep South, his parents worked for a "fine woman" who would often feed him, but only after he had entered her home through a rear door. Declaring that he could no longer demean himself so, he advocated unionization to eliminate all vestiges of petty indignities. It is disputed whether he called this "fine" woman "white," but it is clear that she was and that all his listeners understood that. However, this story and the bakery incident involving Negro workers are the only allusions, direct or oblique, to racial matters in the Bascomb speech.

St. George Cross, on the other hand, specifically invoked the civil rights movement throughout his speech. He began by explaining that he was replacing the scheduled NAACP speaker, who had gone to Mississippi to aid a Negro civil rights worker fired from his job. This opening note served both as an explanation of his appearance and as a lesson in the advantages of unionization for Negroes. Paralleling the civil rights and labor movements, he emphasized the results attainable through unity and noted that a white woman, Mrs. Viola Liuzzo, who had

given her life for the Negro cause, was the wife of a union member.

Cross also mentioned the sniper slaying of NAACP organizer Medgar Evers. He did so in the context of showing the workers that no similar dangers attended their organizational activity which, like Evers's, was aimed at achieving a higher standard of living and enhanced personal dignity. Following his references to civil rights deaths in the Deep South, Cross said:

"Tomorrow when you go to vote there won't be any dogs, there won't be any fire hoses, there won't be any Ku Klux Klan, and there won't be anything to stop you. All you have to do is go down to your place of work and there will be someone to vote. You will be among friends. There will be none of the pressures these people had to face. But when you go down there I want you to vote yes. * * * I want you to say 'I want the union.' "

Cross did not discuss the management of Baltimore Luggage, other than by implying, in the quoted portion of his speech, that it was a more benign group than the Southerners with whom civil rights workers had to deal.

■ The standards to be applied in determining whether racially-oriented remarks vitiate an otherwise valid election were established by the Board in Sewell Manufacturing Co., 138 NLRB 66, and specifically adopted by this court in NLRB v. Schapiro & Whitehouse, Inc., 356 F.2d 675, 679 (4th Cir. 1966). In Sewell, the Board recognized that a relevant campaign statement could not be condemned simply because it deals with racial matters. Temperate statements with racial overtones "must be tolerated because they are true and because they pertain to a subject concerning which employees are entitled to have knowledge —the union's position on racial matters." What the Board refused to tolerate were "appeals or arguments which can have no purpose except to inflame the racial feelings of voters in the election." In short, the Board announced its policy to be that in the absence of a deliberate at-

tempt to "overstress and exacerbate racial feelings by irrelevant and inflammatory appeals," it would uphold elections which were preceded by racial statements "temperate in tone, germane and correct factually." [1]

Such a test, of course, requires a case-by-case application, with particular regard to the facts in each instance. See Sharnay Mills, 120 NLRB 750, 751. In *Sewell* itself, for example, the Board set aside the election because the employer engaged in an unmitigated campaign to inject the irrelevant and explosive issue of "race mixing" in the unionization drive. He inundated his employees with propaganda material, including large newspaper pictures purportedly showing white labor leaders dancing with Negro women and an unidentified Negro man dancing with a white woman, above a caption reading "The CIO strongly pushes and endorses the FEPC." By way of contrast, in Allen-Morrison Sign Company, 138 NLRB 73, decided the same day as *Sewell*, the Board upheld an election despite an employer statement that the union actively promotes integration and "tries to force [it] down the throats of the people living in the South." The rationale of the *Allen-Morrison* case is that this temperately-advanced remark was germane and a matter of genuine interest to the white southern workers whom the union was attempting to organize.

In adopting and applying these principles in *Schapiro & Whitehouse,* supra, this court found that the propaganda preceding the extremely close election (89–88) was "so irrelevant and so highly inflammatory, * * * as to invalidate the election." The language most in question there is as follows:

"If you are going to let this scare you, then you've lost and the company has won. Remember this, the people at Cambridge didn't get scared nor did they give up because their friends were arrested. Instead, the demonstrations grew bigger.

This is the position that you must take. Show this company that you're not going to back up. Over the years, you have been held down.—Let us help you to get up."

This leaflet was distributed at the Baltimore plant of Schapiro & Whitehouse in the summer of 1963, when the bitter racial disturbances at Cambridge monopolized the headlines of Maryland's newspapers. More importantly, the campaign literature clearly identified the Company with the alleged oppressors in the Eastern Shore community. Spewing forth thinly-veiled anti-white venom, the literature, under the circumstances there, may well have inhibited a "sober, informed exercise of the franchise."

That is not the situation in the instant case. The disputed propaganda was clearly not for the purpose and could not have had the effect of exacerbating racial prejudices. This was no gospel of hate. Rather than appealing to deep-seated emotional fears, the letter and speeches temperately addressed themselves to the economic and social self-interest of the workers, over ninety per cent of whom were Negro. Such an exhortation must be a legitimate tactic in any pre-election campaign. Archer Laundry Co., 150 NLRB 1427; Aristocrat Linen Supply Co., 150 NLRB 1448.

The relevance of these appeals is obvious. Just as it was germane for white workers in a southern community to be apprised of the union's stand on integration, and just as "no one would suggest that Negro workers are not entitled to know that the union seeking to represent them engages in racial discrimination," [2] so it is highly pertinent for the predominantly Negro electorate to be told of the NAACP's support of the Union and the advantages which unionization and union tactics, and par-

---

1. No issue was raised in our case as to the factual validity of any of the statements to which the employer objects.

2. Sovern, The National Labor Relations Act and Racial Discrimination, 62 Colum. L.Rev., 563, 626 (1962).

ticularly this Union's favorable attitude, have secured for Negroes.

The Board, which has the primary responsibility and broad discretion in determining the validity of elections and the propriety of pre-election campaigning,[3] and this court must be mindful of two judicially noticeable facts—the particularly severe economic plight of the Negro in this country and the undeniable history of hostility between the Negro community and organized labor. Statistics demonstrating that Negroes suffer "disproportionately high unemployment and disproportionately low earnings"[4] are readily available. The 1966 Statistical Abstract of the United States shows that while the median income of white families increased from about $3100 to $6800 betwen 1947 and 1964, that of nonwhite families rose from a lowly $1600 to only $3800 during the same period. The unemployment figures show that in 1966 the rate of Negro unemployment was nearly two and a half times that of whites. 90 Monthly Labor Rev. 84 (Feb. 1967). Plainly, Negroes constitute an identifiable economic bloc with a special problem, and thus it is legitimate for them to consider how their interests may be particularly affected in choosing whether to join or refrain from joining a union.

The traditional antagonism between labor unions and Negroes is well chronicled in Prof. Marshall's article Unions and the Negro Community, 17 Ind. & Lab.Rel.Rev. 179 (1964). As early as 1913, the most eminent and revered Negro leader of the time, Booker T. Washington, advocated a Negro alliance with business against unions and white employees in retaliation for the discriminatory practices of AFL affiliates.[5] Noting that the labor movement's discrimination contributed to the Negro's depressed economic status, Marshall reports that "by the time the CIO was founded, therefore, there was considerable hostility between unions and the Negro community." Negro disenchantment with and suspicion of organized labor persisted in the 1940's and by the time of the AFL–CIO merger in 1955, there was evidence of a "growing gulf between the labor movement and the Negro community." Marshall, finding a currently wide gulf and a persisting belief by Negroes that unions are partly responsible for their economic situation, concludes that "the unions' unfavorable image in the Negro community has hindered organizing among unorganized Negroes." In recent years, however, there have been signs of a more equitable racial attitude on the part of some unions, and certain Negro organizations, notably the NAACP, have been preaching unionization to their followers.

It is in the light of the Negroes' peculiar plight and their special relationship with organized labor that the letter and the speeches in this case must be viewed. Dr. Jackson's letter informing a Negro electorate that one of the leading and most respected Negro organizations sponsored the union and documenting the assistance which unions have given Negroes presented considerations manifestly germane to the issue of whether a union would materially benefit the worker and his family. Similarly, Mr. Cross's rhetoric, analogizing the labor and civil rights movements and showing the community of interest between the two, was quite appropriate. Nor can there be any doubt of the relevance of Rev. Bascomb's argument that through unionization self-respect and dignity, considered by at least one social commentator to be a primary solution to this nation's racial dilemma,[6] may be effected.

---

3. See, e. g., NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946) ; NLRB v. Shirlington Supermarket, Inc., 224 F.2d 649, 651 (4th Cir. 1955).

4. Sovern, op. cit., at 563.

5. For a discussion of organized labor's discriminatory practices against Negroes, see Rosen, The Law and Racial Discrimination in Employment, 53 Calif.L.Rev. 729, 731–34 (1965).

6. C. Silberman, Crisis in Black and White, 11.

Far from diminishing the sobriety of the election, this propaganda material may have substantially increased the possibility of a rational, well-informed electorate.

Applying the *Sewell* standard adopted in *Schapiro & Whitehouse*, we find the disputed statements to be germane, temperate and factual. The Board's order will therefore be enforced.

Enforced.

BOREMAN, Circuit Judge (dissenting):

Most respectfully I submit this statement of my disagreement with the decision of the majority.

The disturbing question is whether the pre-election racial references made by agents and representatives selected by and acting on behalf of the Union exceeded the permissible propaganda limits which the Board has had occasion to delineate and concerning which this court has spoken.

In Sewell Manufacturing Company, 138 N.L.R.B. 66, the Board considered objections to an election based upon the employer's pre-election propaganda touching upon racial matters. There the Board said:

" * * * in election proceedings it [the Board] seeks 'to provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees.' Where for any reason the standard falls too low the Board will set aside the election and direct a new one.

* * * * * *

"Our function, as we see it, is to conduct elections in which the employees have the opportunity to cast their ballots for or against a labor organization in an atmosphere conducive to the sober and informed exercise of the franchise, free not only from interference, restraint, or coercion violative of the Act, but also from other elements which prevent or impede a reasonable choice." (pp. 69–70.)

Further, in *Sewell*, the Board recognized the fact that prejudice based on color is a powerful emotional force and that a deliberate appeal to such prejudice is not intended or calculated to encourage the reasoning faculty. The statement was there made that the Board did not intend to tolerate as "electoral propaganda" appeals or arguments which can have no purpose except to inflame the racial feelings of voters in the election.

It is particularly noted that the statements and declarations of the Board in *Sewell* were made with respect to the *employer's* efforts to inject irrelevant and inflammatory racial issues into the election campaign. In N.L.R.B. v. Schapiro & Whitehouse, Inc., 356 F.2d 675 (1966), this court, speaking through Judge Bryan and approving *Sewell*, refused to enforce the Board's order which, in effect, upheld the results of an election favoring the union where the *union* had distributed pre-election leaflets which this court found to be irrelevant to the election issues and racially inflammatory.

In the instant case 134 out of 144 employees at Baltimore Luggage were Negroes and at the meeting arranged by the Union on the eve of the election some 50 to 75 of the employees were in attendance, all Negroes. The two principal speakers were Negroes, one a minister who had exhibited an active interest in the civil rights movement, and the other an active representative of the NAACP. Several days prior to the meeting the Union had distributed a letter, signed by Dr. Lillie M. Jackson, written on the stationery of the Baltimore Branch of the National Association for the Advancement of Colored People, in which she purported to speak for those in the Baltimore Branch of that organization. She urged the workers to vote for the union and in explaining her reasons

she said: "Our sympathies are with the labor movement because they have demonstrated that they are our friends and have helped us in our civil rights struggles. They have marched with us in Washington and from Selma to Montgomery. The wife of a Union official gave her life in our cause."

The Negro minister who spoke at the meeting recounted his experience when he had gone, in his boyhood, to the back door of the home where his mother was employed and was there fed. Undoubtedly everyone understood that the home was that of a white woman. He stated frankly and "advisedly" that he was glad *that the mistress of the house was gone* and, in effect, that she would be very much upset if he were to come to her home again because he could no longer in good conscience go to her back door and eat as he once did and she would be very disappointed and upset if he went to her front door.

Particularly objectionable was the election eve speech of NAACP representative Cross. The speech as reconstructed indicates that portions of it were expressly designed and intended to inflame the racial passions of those voters present. He began by announcing that he was speaking in the place of another NAACP representative who was required to go to Mississippi because a *Negro civil rights worker* had been fired from his job. He thus set the racial tone of his talk by this first reference to a civil rights incident totally unrelated to the Baltimore Luggage election or the Union itself. Then, after making a statement apparently aimed at showing the importance of organization, he stated:

"*  *  *. As a member of the NAACP I think that I could not speak to you without reminding you of some of the work of our great freedom fighters. I will try to tell you about two of them. One is Medgar Evers and the other is Viola Liuzzo. Mr. Evers was born in Mississippi and was educated

there and as he grew up as a young man he realized that there were certain things that were not opened to him. As he grew older however, our country went to war, and he was called over seas to fight for our country. While he was over there he had to go before rifles fire, before bombs and everything, as the American fought against the tyrants of Europe and the different tyrants of the Pacific. But, he lived through it to return to his home state of Mississippi and while he was there when he returned he found out that the same tyranny which he was fighting in Europe was there in Mississippi that he decided to work against it. And through his work with the NAACP he became one of the most influential field secretaries. But we all know what happened to him while he did his work. One night when he came home from doing his work in the fields. As he got out of his car to go home he was shot in the back. Now when Evers decided to do this work he realized that what he was doing was putting his family and his friends in great jeopardy. But he decided to do it all the same. And so gave his life for the movements. And another member was Mrs. Viola [Liuzzo] who I'm sure you all read about in your magazines and so on. She was a housewife from Detroit. Her husband is a laborman. And she went to Alabama to do her part to fight for social economic justice for all Americans black and white. And while she was there unknown to her she was being followed and was finally killed. I think that as she died she might have said 'I have done my part for America,' and that is what I would like to ask you tonight. Have you done your part? *  *  *."

These references to the violent deaths of two civil rights martyrs were certainly not germane to the election issues and were calculated to be highly inflammatory. Directed as they were to the Negro employees, the remarks could only arouse

emotions and inflame racial feelings. This intemperate appeal had the effect of bringing the election into an improper perspective, namely that the election about to be held was an integral part of the civil rights struggle of the American Negro. Cross drove this point home when, after referring to the part that Mrs. Liuzzo played in the movement, asked the workers whether they had done their part. Similarly, his intemperate references to fire hoses, dogs, and the Ku Klux Klan were obviously intended to incite and inflame the racial feelings of his listeners. The mere mention of these symbols of racial hostility, toward those engaging in civil rights demonstrations, even though negatively stated, were to be condemned because of their inflammatory character and total irrelevance to the Baltimore Luggage situation.

The Board, in its decision, and my brothers who now speak as a majority, assert various reasons as to why the Union's racially oriented propaganda did not overstep the permissible bounds. In short substance, the reasons assigned are that the propaganda in question merely consituted an appeal to solidarity through the Union in order to achieve for the Negro employees the economic equality which, it is contended, has long been denied to Negroes generally. It is thus permissible, they argue, that the Union propaganda should equate an election victory with the civil rights struggle because economic oppertunity is one of the basic aims of the civil rights movement and reference to that movement is therefore germane to the election. These arguments, however, fail to heed this court's express admonition in N.L.R.B. v. Schapiro & Whitehouse, Inc., supra, that the question of "[e]quality of race in privilege or economic opportunity" was not an issue in the election and the fact that "a majority of the employees were Negroes did not make it so. * * *. The reliance upon race inhibited a 'sober, informed exercise of the franchise' and was altogether out of place." 356 F.2d at 679.