NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SUMTER PLYWOOD CORPORATION,
Respondent.

No. 75–1391.

United States Court of Appeals,
Fifth Circuit.

July 23, 1976.
Rehearing and Rehearing En Banc
Denied Oct. 6, 1976.

11. 445 F.2d at 550.

918

Elliott Moore, Deputy Assoc. Gen. Counsel, Grant Morris, N.L.R.B., Washington, D. C., Walter C. Phillips, Director, Region 10, N.L.R.B., Atlanta, Ga., for petitioner.

Paul O. Miller, III, James R. Lockard, Jackson, Miss., for respondent.

Before BROWN, Chief Judge, GOLDBERG and RONEY, Circuit Judges.

GOLDBERG, Circuit Judge:

The National Labor Relations Board (the Board) petitions this Court for enforcement of its order that Sumter Plywood (the Company) bargain collectively with the Southern Council of Industrial Workers, United Brotherhood of Carpenters and Joiners of America, AFL–CIO (the Union). The Company, as respondent, argues that enforcement should be denied because of alleged improprieties on the part of the Union in its organizational campaign, and because of alleged procedural and substantive deficiencies in the Board's review of the Company's challenge to the Union's certification. Although this is by no means an easy case, we have concluded for the reasons that follow that the Union was properly certified by the Board, and thus that the Board's order must be enforced.

## I. PROCEDURAL BACKGROUND

The Company is engaged in the manufacture and sale of plywood and lumber products in Livingston, Alabama. Pursuant to the Union's representation petition, and after an organizational campaign to be discussed below, an election was held among the workers at the Company on November 16, 1972. The unit, stipulated to be appropriate, included approximately 241 eligible voters, 204 of whom were black. The tally showed 156 votes for the Union and 77 against, with only four ballots challenged or void.

The Company filed seven objections to behavior alleged to have affected election results. The Board's Regional Director investigated these objections and in February, 1973, issued a Report recommending that the Company's objections be overruled and that the Union be certified. The Company filed four exceptions to this Report. In May, 1973, the Board issued a decision adopting the findings, conclusions and recommendations of the Regional Director, and certifying the Union. Chairman Miller dissented in part from this decision.

Thereafter, the Union requested that the Company begin negotiations. The Company refused to negotiate, and the Union filed an unfair labor practice charge with the Board, alleging that the Company refused to bargain in violation of Section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1970). After investigating the charge, the Regional Director issued a complaint against the Company in July, 1973. In its answer the Company admitted its refusal to bargain, but challenged the certification of the Union on the grounds 1) that the Regional Director should have sustained the Company's earlier objections to the election, or, in the alternative, that the Company was entitled to a hearing on those objections, and 2) that the Union engaged in racial discrimination (anti-white), which rendered the Union ineligible to utilize the remedial machinery of the Board.

In October, 1973, the Board's General Counsel moved for summary judgment.

The Board then transferred the proceeding to itself and ordered the Company to show cause why the motion should not be granted. After reviewing the Company's response, the Board in May, 1974, denied summary judgment, but ordered that a hearing be held only on the specific issue of alleged misrepresentations by the Union concerning initiation fees, fines and dues, the subject of one of the Company's original objections.

After a hearing, an administrative law judge (ALJ) found the indicated objection to be without merit. Accordingly, she concluded that the Company had violated Section 8(a)(5), and recommended that the Board issue an order requiring the Company to bargain on request and certain other relief. After reviewing the record and the ALJ's decision in light of the Company's exceptions and a supporting brief, a unanimous panel of the Board affirmed the ruling, findings, and conclusions of the ALJ, and adopted her recommended order.

The Board now seeks enforcement of that order. Since the Company has admitted its refusal to bargain, the only question before us is whether the Board's conclusion that the Union was a properly certified bargaining agent can be sustained. To answer that question, we must examine several specific allegations of Union improprieties in the election campaign, as well as the broader claim that the Union is racially discriminatory.

## II. THE ELECTION

■ At the outset we note that, as a general rule, the burden is on the party seeking to overturn a Board-conducted representation election to establish that the election was not fairly conducted. *N.L.R.B. v. Mattison Machine Works*, 1961, 365 U.S. 123, 124, 81 S.Ct. 434, 5 L.Ed.2d 455. The question of whether challenged conduct tended to interfere with employees' free choice is one primarily left to the Board's discretion. *N.L.R.B. v. A. J. Tower*, 1946, 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322; *N.L.R.B. v. Bancroft Mfg. Co.*, 5 Cir. 1975, 516 F.2d 436, 439, *cert. denied*, 1976, 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318;

*N.L.R.B. v. Trinity Steel Co.*, 5 Cir. 1954, 214 F.2d 120, 123.

■ Although the Board aspires to "laboratory conditions" in elections, *General Shoe Co.*, 1948, 77 NLRB 124, we recognize that clinical asepsis is an unattainable goal in the real world of union organizational efforts. On the contrary, it is often the case that "exaggerations, hyperbole and appeals to emotions are the stuff of which election campaigns are made." *Schneider Mills, Inc. v. N.L.R.B.*, 4 Cir. 1968, 390 F.2d 375, 379 (en banc). *See also Baumritter Corp. v. N.L.R.B.*, 1 Cir. 1967, 386 F.2d 117, 120; *Collins & Aikman Corp. v. N.L.R.B.*, 4 Cir. 1967, 383 F.2d 722, 726. Some degree of puffing and propagandizing must be permitted, else the laboratory would be found infected in every case.

Because of our deference to the Board's expertise in these matters, and our recognition that laboratory conditions cannot be expected to prevail, we have explained the burden placed on the objecting party in the following terms:

> This is a heavy burden; it is not met by proof of mere misrepresentations or physical threats. Rather, specific evidence is required, showing not only that the unlawful acts occurred, but also that they interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election.

*N.L.R.B. v. Golden Age Brewing Co.*, 5 Cir. 1969, 415 F.2d 26, 30.

It is against the background of these general principles that we examine the specific instances of improper conduct alleged by the Company.

### A. *Misrepresentations About Fees and Fines.*

Throughout these long proceedings, the Company has asserted that the possibilities for a free and fair election were significantly diminished by the Union's statements regarding union fees and fines. Statements made by Sylvester Hicks, a leader of the Union's organizational effort, at meetings and a leaflet distributed nine days

before the election carried the following message to employees:

YOU DON'T PAY ANYTHING TO JOIN, THERE ARE NO INITIATION FEES! THERE ARE NO ASSESSMENTS! THERE ARE NO LABELED FINES!

The Company argues, as it did before the Board, that the statements regarding initiation fees and fines are prejudicially inaccurate. The Union's Constitution specifically requires an initiation fee of between fifteen and twenty-five dollars per new member, and the Company asserts that the Union's failure to apprise the employees of this fact was a misrepresentation sufficient for the election to be set aside. The Company challenges the statement, made by Hicks and in the leaflet, that "there are no labeled fines," on the ground that this obscures the fact that the Union can impose "ordinary" fines for violations of by-laws.

These issues come to us in a different procedural posture than those to be discussed below. In denying the General Counsel's motion for summary judgment, the Board directed that there be a hearing on the Company's Objection No. 3, which dealt with the alleged misrepresentations about the cost to the employees of joining the Union. After that hearing, the ALJ found that the challenged statements "did not constitute a substantial misrepresentation of a material fact in issue in the campaign which would reasonably be expected to have a significant impact on the election." Accordingly, she concluded that the objection had been properly overruled in the certification proceeding.

▮ The Board affirmed the ALJ's findings and conclusions. Substantial evidence

clearly supports this decision. As to the initiation fees, the Company admits that evidence before the ALJ showed that it had been the standard practice of the Union to waive initiation fees for new members for ninety days following the organization of a new local. The waiver applies to employees whether or not they have signed authorization cards and irrespective of how they voted in the election.[1]

The Company argues that the bare statements that there were no initiation fees were nevertheless significant misrepresentations because the waiver was not automatic and was not under the sole control of the local—it had to be requested in each case by the Southern Council and then granted by the International Office. It is the Company's contention that

> If the employees were not told about each and every step which must be taken before the possibility that initiation fees could be charged was eliminated and/or were told no initiation fees could ever be charged under any circumstances, a misrepresentation was made which was sufficient to cause the election to be set aside.

The evidence on this issue led the ALJ to the following finding:

> With respect to initiation fees, the Union's statement . . . is not a complete and full explanation but, in the context of the Union's established practice and the information previously supplied employees at meetings, it is not a misrepresentation.

The evidence fully supports that statement[2]—the Company's assertion that the Union materially misrepresented its policy on initiation fees is without merit.

---

1. The absence of discrimination on the basis of card-signing *vel non* renders *N.L.R.B. v. Savair Mfg. Co.,* 1973, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495, inapplicable to this offer of a waiver of initiation fees. *See N.L.R.B. v. Bancroft Mfg. Co.,* 5 Cir. 1975, 516 F.2d 436, 444, *cert. denied,* 1976, 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318.

2. Hicks testified that in his 17 years with the International he had never known any industri-

al local member who was required to pay an initiation fee in a "right to work" state (such as Alabama), and that the Union advocates that locals in these states not charge initiation fees. During the 90 day period of the initial waiver, the local is authorized to ask the Union to grant a continuing dispensation from the constitutional provision; such dispensation is automatically granted.

■ The "no labeled fines" statement, in the context of the entire campaign, also seems insignificant. At the hearing, Hicks defined the term as "a set fine for a set offense," and contrasted it with "ordinary" fines. The latter presumably would be fines levied pursuant to Section 45 of the Union Constitution, which provides as follows:

> The Council shall have the power to buy and collect fines for violations of the laws, trade and other rules of the council: such fines to become part of the revenue of the council.

The Company argues that the "no labeled fines" statements, even if technically accurate,[3] must have had the very misleading effect of making the employees believe that the Union imposed no fines at all.

The ALJ made the following findings in respect to this argument:

> Insofar as employees were concerned with what specific fines for what conduct they would generally subject themselves to by becoming members, Hicks' reply i. e. that there were no "labeled fines" may have been evasive but it was not a misrepresentation. Moreover, [the Company] had already addressed its campaign literature to . . . the subject of fines, before the Union's November 7, bulletin [containing the "no labeled fines" statement].

We note further that Hicks testified at the hearing that he had also told the employees at the meeting that "really I never knew anything about a fine period at all." He indicated that this was indeed the state of his knowledge—in his 17 years with the Union, he knew of no fine, "labeled" or otherwise which had been levied on a member of an industrial local. No evidence was adduced to contradict the inference which might be drawn from Hicks testimony, i. e., that prospective Union members had very little to fear in respect to possible fines.

In these circumstances we must sustain the conclusions of the ALJ, adopted by the Board, as supported by substantial evidence. To whatever extent that the statements regarding fines could be construed as misrepresentations, they could not have had a material effect on this election won overwhelmingly by the Union.

### B. Hicks' Statement About Cards.

The Company's Objection No. 1 to the election charged that the Union "threatened employees with statements to the effect that the employee could get hurt if he did not vote for the [Union]." During the Regional Director's investigation of the objections prior to certification of the Union, the Company presented an employee witness who testified that Hicks had said, at an employee gathering, "if you did not sign the [authorization] card you could not work at the plant after the Union won the election." The Company also presented that employee's affidavit to the same effect.

In overruling this objection, the Regional Director simply stated, "No evidence in support of Objection 1 was presented by the Employer or adduced by the investigation." Chairman Miller, in partial dissent from the Board's order certifying the Union, thought that the above affidavit showed that the Regional Director's stated ground for overruling the objection was in error. Chairman Miller would have remanded Objection No. 1 to the Region "for further investigation, a hearing if necessary, and a Supplemental Report." The majority of the Board, however, decided to adopt all of the Regional Director's findings and recommendations. The majority commented on Objection No. 1 as follows:

> With respect to Chairman Miller's partial dissent, we would simply point out that the Board has repeatedly held that a statement, such as that in the employee affidavit he refers to, is not a threat of reprisal sufficient to set aside an election,

---

3. Actually, there was one "labeled" fine in the Union Constitution, even under Hicks' definition. A set fine was to be imposed on a member who attempted to pass himself off as a Union Business Representative. The ALJ found that the sanction for impersonating Business Representatives was not a burning issue in the campaign, and the Company does not challenge her finding.

because the Union did not have the power to carry out such a threat of job loss. *See, e. g., Rio de Oro Uranium Mines, Inc.,* 120 NLRB 91, 94.

In the subsequent unfair labor practice proceeding against the Company for refusal to bargain, the Company argued that it was entitled at least to a hearing on Objection No. 1. A unanimous panel of the Board, including Chairman Miller, rejected that argument and ordered the Company to bargain.

We do not understand the Company now to argue that the alleged statement on its face constituted a sufficient ground upon which the Board should have refused to certify the Union. Rather, the Company asserts only that it was entitled at some point to a hearing on the issue of the effect of the statement.

The Company objects to the Board's characterization of the statement as a "threat," since that label would carry with it in this context a rather solicitous standard of review. *Cf. Rio de Oro Uranium Mines, supra.* Were the statement only a "threat," the fact that the Union obviously would not have the power to carry out the threat would decide the issue of the Board's favor.

■ The Company contends that Hicks' statement should be treated instead as "a misrepresentation and/or the promise of a special benefit." Were it to be perceived as a "promise of benefit," we believe that, in this situation, substantially the same analysis as that attending the label "threat" would obtain.[4] When it should be obvious to reasonable minds that the Union had no power to deliver the special benefits, there is no reason to believe that the promise affected the election. *Cf. N.L.R.B. v. Sa-*

*vair Mfg. Co.,* 1973, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495.[5]

■ If we assume that Hicks' statement was in the nature of a "misrepresentation," *e. g.,* a prediction that the employer would adopt a policy of discharging non-card-signers, or a purported statement of law, then a slightly different analysis should be applied. In *Bancroft,* we restated a four-pronged test, drawn from former Board and Fifth Circuit cases, for evaluating misrepresentations:

(1) whether there has been a misrepresentation of a material fact; (2) whether the misrepresentation came from a party who was in a position to know the truth or who had special knowledge of the facts; (3) whether the other party had adequate opportunity to reply and to correct the misrepresentation; and (4) whether the employees had independent knowledge of the misrepresented facts, so that they could effectively evaluate the propaganda.

516 F.2d at 443. These tests should be seen as a systematic approach to be used in answering the general question implicit in the language quoted from *Golden Age, supra*: whether the misrepresentations "interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." 415 F.2d at 30.

■ The question before us, of course, is not whether these standards were met in this case, but rather, it is whether the Company presented enough evidence to entitle it to a hearing on the issue. A hearing is certainly not required in every case to determine the validity of objections to a Board-conducted election. *N.L.R.B. v. Smith Industries, Inc.,* 5 Cir. 1968, 403 F.2d

---

**4.** *Cf.* 29 U.S.C. § 158(c) [Section 8(c)]:

The expressing of any views, argument, or opinion, . . . shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

*Cf. also N.L.R.B v. Gissell Packing Co.,* 1969, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547:

[A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit."

**5.** In *Savair* the promise of benefit—that the Union would waive initiation fees for employees signing cards—was clearly within the control of the Union.

889, 894. Indeed, the relevant statutes themselves make no provision for a post-election evidentiary hearing in a representation proceeding. The Board has provided by regulation, however, for such a hearing when the objections raise "substantial and material factual issues" which can be resolved only after a hearing. 29 C.F.R. § 102.–69(c), (d), (e). We discussed the showing necessary to require a hearing in *Golden Age, supra:*

> If the objection party shows, by specific evidence which prima facie would warrant setting aside the election, the existence of substantial and material factual issues which can be resolved only after an opportunity to observe and examine witnesses, an evidentiary hearing will be ordered. . . . To meet this burden, there must be "specific evidence of specific events from or about specific people" in support of allegations having a basis in law sufficient to overturn the election.
> . . .

415 F.2d at 32–33 (citations omitted).

Under the above standards, and assuming as true the allegation that the Hicks statement was made, we conclude that the Board in the context of this case was not required to hold a hearing. We would have little difficulty in finding that the statement was a misrepresentation of a fact that could in some circumstances be material in affecting an individual employee's actions. The Company, however, has offered no evidence beyond a showing that the statement was made on one occasion two weeks before the election. In the face of a 156–77 election victory for the Union, the fact of the statement alone is insufficient support for an allegation that the statement materially

affected the election.[6] To overturn the election on this point, the Company would need to show that great numbers of employees were aware of Hicks' statement, that great numbers of these employees lacked independent knowledge of the matter,[7] that great numbers of employees in fact signed cards after the statement, and that, despite this widespread acceptance of the false statement made two weeks before the election, the Company had a valid excuse for not responding. Each of these points was susceptible to some offer of proof by the Company during the Regional Director's investigation, yet none was forthcoming. In these circumstances, we decline to deny enforcement because of the Board's decision not to require a hearing on this question.

### C. The Racial Orientation of the Campaign.

■ The general standards enunciated at the outset of this section are subject to exception in at least one important situation relevant to this case. When racial considerations have been injected into a representation campaign by the party which prevails in the election, this Court in some circumstances will cast a burden on that party to establish that the racial message was truthful and germane, "and where there is doubt as to whether the total conduct of such party is within the described bounds, the doubt will be resolved against him." *N.L.R.B. v. Bancroft Mfg. Co., supra,* 516 F.2d at 440–41, quoting *Sewell Mfg. Co.,* 1962, 138 N.L.R.B. 66, 71–72. From *Bancroft* and the authorities relied upon therein, it appears that the major concern in this regard is that workers of

6. *See United Steel Workers of America, AFL–CIO v. N.L.R.B.,* 5 Cir. 1974, 496 F.2d 1342 n. 11:

> If the vote margin in a representational election is very narrow, minor violations should be more closely scrutinized. In other words, when the apparent degree and multitude of the violations are small and the margin of the vote is wide, the less merit inheres in a petition for overturning the Board's decision upholding an election or denying an evidentiary hearing.

Majoritarianism is not, of course, uniformly redemptive. We cannot say that because the Union won by a large margin, it has been cleansed of all its sins. Rather, the landslide tells us that unless a sin was truly grievous, it probably was not "material."

7. We are offended by the Company's implicit suggestion that we should take judicial notice of the fact that these employees were not very bright.

one race not be persuaded to vote for or against a Union on the basis of invidious prejudices they might have against individuals of another race.[8] Clearly, some statements regarding the effect that a Union might have on the workers of a particular race can be acceptable.[9]

As with the objection relating to the statement about signing cards, there was never a formal hearing on this issue of racial taint. Thus even if we conclude that the facts found by the Board were not sufficient for the election to be invalidated as tainted by racial considerations, we still must face the question of whether the proffered evidence was sufficient to require a formal hearing on the issue. In the context of the racial taint issue here, the two questions are substantially the same, since the Company bases its arguments largely on the incidents found to be facts by the Regional Director. In reviewing the Board's refusal to order a formal hearing, we assume as true any further allegations made by the Company which are supported by the proffer of specific evidence.

*Bancroft* indicates that the reversal of burden of persuasion occurs if the racial remarks "form the core or theme of the campaign," or if the statements are racially inflammatory. 516 F.2d at 442. If neither condition obtains, the injection of racial considerations should be reviewed under the familiar standards applicable to other types of alleged improprieties. *Id.* We will examine, then, the incidents cited by the Company and noted in the Regional Director's initial Report on Objections, to determine if the evidence and specific allegations could support a finding that racial considerations either formed the core or theme of the campaign, or, though not central, were nevertheless "inflammatory."

The electorate, as we have noted, was overwhelmingly black—204 out of 241 eligible voters. The charges leveled by the Company at the Union's attempt to woo this electorate can be grouped roughly into one alleged sin of omission—the exclusion of whites from the campaign—and one alleged sin of commission—the Union's affirmative "appeal to racial hatred and prejudice." Respondent's Brief at 19.

Statements of white workers reviewed by the Regional Director in his investigation indicated that some of the Union's black organizers specifically avoided giving to whites the campaign material that the organizers distributed to blacks at the plant gate. One white worker who was handed a campaign handbill testified to circumstances which made the distribution of the literature to him seem unintentional. These white workers stated that they were never invited to join the Union or to attend any Union meetings, and that they knew of no white workers who were so invited. The Union organizational meetings were, with the exception of a white Union organizer, attended only by blacks. One Union organizer admitted that he had not contacted any whites during the campaign.

Other evidence before the Regional Director indicated that whites were not totally excluded from the campaign. One white Union organizer stated that he had contacted a number of white employees early in the campaign. White employees were included in the Union's mailing of campaign materials shortly before the election.[10]

---

**8.** The facts in *Bancroft* and *Sewell* are summarized in text, *infra.*

**9.** *See generally Bancroft, supra; N.L.R.B. v. Baltimore Luggage Co.*, 4 Cir. 1967, 387 F.2d 744, *enforcing* 162 N.L.R.B. 1230; *Aristocrat Linen Supply Co., Inc.*, 1965, 150 N.L.R.B. 1448; *Archer Laundry Co.*, 1965, 150 N.L.R.B. 1427; *Allen-Morrison Sign Co., Inc.*, 1962, 138 N.L.R.B. 73. *Cf. Sewell, supra; N.L.R.B. v. Schapiro & Whitehouse, Inc.*, 4 Cir. 1966, 356 F.2d 675.

**10.** The Company argues that this mailing to whites should be discounted as a demonstration of even-handedness, since the *Excelsior* mailing list given the Union by the Company did not specify the race of the employees, and thus the Union could not feasibly contact only the blacks. *See Excelsior Underwear, Inc.*, 1966, 156 NLRB 1236. If it had been the intent of the Union to limit its campaign exclusively to blacks, however, the Union could simply have eschewed the colorblind mailing which obviously would reach whites, and concentrat-

The allegations of the Company and the evidence before the Regional Director are sufficient for us to conclude that the Union's campaign evinced only a minimal interest in the white voters. The Board, at oral argument, conceded that this was a fair characterization of the campaign. This concentration on voters of one race, to the relative exclusion of voters of the other, is disturbing and is not to be condoned, but we feel that it is not enough in itself to invalidate the election, at least in the absence of any indication either that whites were absolutely excluded or that leading Union organizers deliberately promoted a policy of excluding workers of one race from the campaign. That the Union's appeal in this case was predominately to blacks does not in itself tell us either that race was the theme of the campaign, or that the Union's appeal was inflammatory. Rather, we think the racial one-sidedness of the Union's effort should be given the analytical effect in our review of intensifying the scrutiny with which we regard the incidents of the Union's "appeal to race hatred" cited by the Company.[11]

The Union's major literary effort in the campaign was an eleven page pamphlet which contained two cartoons arguably racial in tone. One depicted "Uncle Tom" as one of the hurdles that must be crossed on the road to unionism; the other depicted a black man being kicked out of a welfare office, saying "I hope this don't happen to my brothers." The remainder of the pamphlet is classic campaign rhetoric—a colorblind extolment of the virtues of unionism.

At two of the Union's organizing meetings, a local black politician spoke to the all black audience, told them "black people should stick together," and urged them to register to vote. Sylvester Hicks, a major Union organizer, responded to a black employee's complaint about the paucity of black secretaries and supervisors in the plant by saying that blacks had been under slavery for 100 years, but that the Union could help.[12] At another meeting, Hicks said "something about black people being behind for a long time." A statement from one black employee alleged that she had been called a "white mouth" by one of the Union's representatives after she indicated that she would not support the Union.

The Company also presented evidence to the Regional Director to the effect that "black power" bumper stickers appeared on some employee cars about three weeks before the election, and that employees on occasion would exchange a clenched fist salute. The black employees in one department developed a pro-Union cheer a few days before the election which included this "black power" salute.[13]

Upon these allegations and this evidence the Company grounded its charge that the Union improperly injected racial considerations into the campaign. Despite the heightened suspicion with which we regard these incidents, because of the relatively exclusive concentration of the campaign upon blacks, we must conclude that racial considerations did not form the "core or theme" of the Union's campaign, and that the racial messages authored by the Union were not "inflammatory."

---

ed instead on other more individualized forms of information dissemination.

11. We will consider again the racial orientation of the campaign in the context of a separate issue, *infra*.

12. Sylvester Hicks is *deja vu*. He was also the major union organizer in *Bancroft, supra.*

13. The record reveals two other incidents of union-supporting black employees in effect exhorting other individual black employees to support the Union as a matter of black pride. When one employee explained to a union supporter that she had not attended a Union meeting because she had not thought it necessary, the union supporter responded, "that is the reason black people had not gotten any further than they had—because they would not pull together." Another union supporter explained the welfare office cartoon, *supra,* by saying "that was the way the white man had treated the black man for over 100 years."

The bulk of the campaign literature consisted of colorblind unionist appeals.[14] The challenged cartoons are patently inoffensive. The term "Uncle Tom" certainly connotes some racial message, but it also connotes an economic one—the desire for a break with the tradition of economic dependency. As to the objection regarding the black male being booted from the welfare office, we can only note that the era of the invisibility of blacks in illustrative media has passed. The Company's assumption that a white figure would evince no racial message, whereas a black figure constitutes an appeal to racial hatred, is an assumption grounded in a past all too recent, but nonetheless past. Downtrodden workers are ubiquitous in Union organizing propaganda, and in choosing a color for the illustrations here, we cannot expect the Union to have been unmindful that the electorate was almost 85% black.

Nothing in the record indicates that the local politician's exhortation that "black people should stick together" was anything other than an appeal for the employees votes for him in the general election.[15] Hicks' statements to the all black audiences represented an attempt to equate black economic betterment with unionism, but could not be construed as an effort to set blacks against whites or to suggest that blacks were entitled to greater rights than whites.[16]

The black power salutes and bumper stickers indicate only that supporters of the Union identified betterment of the conditions of blacks with a victory of the Union in the election.[17] They do not indicate that the Union campaign was grounded on a black versus white emotionalism. The "white mouth" comment and the few other random incidents with racial overtones suggest perhaps that some supporters of the Union attempted to capitalize on black resentment against previous white oppression by associating anti-unionism with that white oppression. Even under searching scrutiny, however, these few alleged incidents in the context of the entire organizing campaign cannot be seen to rise from de minimis to "central" or "inflammatory" stature.

Our review of the evidence, then leaves us in agreement with the Regional Director, who after a thorough examination into the allegations concluded as follows:

> N.L.R.B. v. Schapiro & Whitehouse, Inc., 4 Cir. 1966, 356 F.2d 675 (statements comparing union struggle in particular plant with recent, nearby incidents of racial violence sufficiently inflammatory to vitiate election Union won by one vote). See also Aristocrat Linen Supply Co., Inc., 1965, 150 NLRB 1448; Archer Laundry Co., 1965, 150 NLRB 1427 (both upholding union election victories despite union campaigns appealing to black pride); Allen-Morrison Sign Co., Inc., 1962, 138 NLRB 73 (employer literature similar to that in Sewell, but acceptable because temperate rather than inflammatory).

**14.** The November 8 booklet, for example, which contained the two challenged cartoons, also included the following: some biblical excerpts; a picture of clasped hands over the message that a union contract means security; an exhortation to resist the Company's possible resort to threats; a reminder that only the Union can protect employees against arbitrary layoffs; an explanation of the virtues of seniority; a cartoon showing a shabbily-dressed individual who says: "I had a chance to Vote Yes"; and a final appeal to "Remember. It is Your Life."

**15.** We have noted that "laboratory conditions" are an almost impossible goal for union elections. We further note, with gratitude, that no one has even suggested that the same goal should set the standard for general political elections. Cf. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 1976, —— U.S. ——, —— n. 3, 96 S.Ct. 1817, 48 L.Ed.2d 346, 44 USLW 4686, 4695 n. 3 (Stewart, J., concurring).

**16.** Compare N.L.R.B. v. Baltimore Luggage Co., 4 Cir. 1967, 387 F.2d 744, enforcing 162 NLRB 1230 (approving Union campaign stressing racial pride in overwhelmingly black unit) with

**17.** There is no suggestion that the Union was officially involved in the black power salutes and bumper stickers, and so we could deny enforcement because of this conduct only if it "disrupted the voting procedure or destroyed the atmosphere necessary to the exercises of a free choice in the representation election." N.L.R.B. v. Golden-Age Beverage Co., 5 Cir. 1969, 415 F.2d 26, 32 n. 5. See also Bush Hog, Inc., 5 Cir. 1969, 420 F.2d 1266, 1268–69; Hobco Mfg. Co., 1967, 164 NLRB 862.

. . . [T]he evidence considered as a whole does not reveal the kind of appeals to racial prejudice, on matters unrelated to the election issues, which make it impossible for employees to exercise the franchise in a sober and informed manner. The Employer presented no evidence of overt appeals to racial prejudice that would tend to engender racial hatred. An overwhelming majority of the employees in the unit were black; the [Union] directed its campaign primarily toward these employees; and because of the general election in which white and black candidates were opposing each other, race was an issue in Sumter County in November, 1972. Certainly, many of the employees were interested in their status as black individuals. It appears from the evidence that [the Union] raised the issue of race in an effort to show that it could bring economic benefits to Negro workers rather than in an effort to inflame racial hatred with irrelevant and unrelated matters.

In one sense discussed above, this case is more difficult than *Bancroft, supra.* We do not have available here a factor which served to buttress our decision to uphold the election there:

This campaign was waged in a bargaining unit which was 57% white and 43% black. As a matter of common sense, any attempt by the Union to set black against white would have been suicidal, for the Union could successfully organize these plants only by forging a harmonious racial amalgam. . . .

. . . [Racially oriented statements by Union organizers] were . . . in the nature of asides addressed to a particular group of employees in the context of a campaign aimed at securing the adherence of all employees to the Union. . .

516 F.2d at 442, 443.

As noted, the unit at Sumter Plywood was 85% black, so "common sense" cannot guide us in the absence of other factors as

to the wisdom *vel non* of a racist campaign.[18] We have looked carefully at the evidence, however, and find that no showing has been made that the campaign was racist. The real thrust of the *Bancroft* rationale, then, applies equally well to this case:

. . . [T]here is no evidence here that the Union told blacks that they ought to dominate the Union or enjoy benefits unavailable to their fellow workers. There is no evidence that the Union sought to incite blacks against whites; at no time were there either acts or threats of interracial violence, and there is certainly nothing to indicate that the black employees were less favorably disposed toward the Company than were their white co-workers, either before or after the remarks in question. In this case there was no racially-oriented campaign; the vast bulk of the literature on both sides was devoted to the economic issues ordinarily found in representation contests: whether the Union or the Company would ensure the highest wages, the best pension plans, the firmest job security. . . .

. . . [T]his record does not disclose that the disputed statements had an inflammatory effect on the black employees.

516 F.2d at 442–43.

Comparing the racially-oriented statements in this case with those permitted, though not condoned, in *Bancroft,* we find that the statements there were more difficult to excuse. Sylvester Hicks was also the Union organizer in *Bancroft,* and there he told black employees that "if the blacks did not stay together as a group and the Union lost the election, all the blacks would be fired." *Id.* at 440. Other statements and rumors from Union people attributed to the specific employer in *Bancroft* an anti-black animus. The racially oriented remarks in our case do not go so far, either in disregard of facts or in specific insinuations about the employer involved.

---

**18.** The racially oriented campaign approved in *Baltimore Luggage, supra* note 9, was conduct-

ed in a unit of 144 employees, 134 of whom were black. 387 F.2d at 745.

The racial messages delivered by the Union here, then, neither formed the core of the campaign, nor were inflammatory, and, in part because these messages dealt largely with subjective matters, it is difficult to characterize the messages as "misrepresentations." A final factor strongly supports our decision not to deny enforcement—the election result was 156 to 77 in favor of the Union. With that majority, a significantly stronger showing of improper consideration of race than was proffered here would be required for us to negate the Board's decision to uphold the election or to remand to the Board for a hearing on the issue.[19]

We emphasize that our decision in *Bancroft* and our decision today, contrasted with *Sewell,* do not reflect a direct racial double standard. In *Sewell* the white employer in Mississippi sought to defeat the Union's 1961 organizing effort by repeatedly stressing to his all-white workforce that the Union was pro-integration. He even circulated a picture of a white Union organizer "dancing with a [black] lady friend." See 138 NLRB at 66–67. Clearly, such messages were not germane to any of the real issues in the Union's campaign, and could only have had the effect of inflaming racial prejudices in an already racially troubled time and place.

■ This decision and *Bancroft* apply the neutral principle that some degree of "consciousness-raising" will be permitted in union organizing campaigns among ethnic groups which have historically been economically disadvantaged, as long as the ethnic message becomes neither the core of the campaign nor inflammatory. For such groups, the call to ethnic pride and unity has a strong claim to congruence with the Union's traditional call to economic better-

ment.[20] This cannot be said of appeals to the "ethnic pride" of historically advantaged groups.

## III. A DISCRIMINATORY UNION?

The Company has raised one other issue which merits attention here. In its answer and brief before the Board in this unfair labor practice proceeding, and in its brief in this case, the Company has argued that the Union was not properly certified because the Union has demonstrated that it will favor black employees to the detriment of white employees, and thus that it is unfit as a collective bargaining agent for all the employees. The Company asserts that, at the least, it should have been granted a hearing on this issue. We will review the evidence proffered by the Company, then, to determine if it supports a *prima facie* case sufficient to warrant a hearing, in the context of this refusal to bargain proceeding, on the question of whether the Union was racially discriminatory. If the evidence does not reach that level, the Board's denial of a hearing was not in error.

The case of *N.L.R.B. v. Mansion House Center Mgt. Corp.,* 8 Cir. 1973, 473 F.2d 471, holds that an employer's objection that a union is racially discriminatory can present a valid defense to a refusal to bargain charge, and that the remedial machinery of the Board is constitutionally unavailable to a union guilty of invidious discrimination. The Board itself has announced in *Bekins Moving & Storage Co.,* 1974, 211 NLRB No. 7, that it will consider, in election procedures, an employer's contentions that a union should be denied certification as a bargaining representative because of asserted discriminatory practices.[21]

**19.** *See* note 6, *supra. Compare Baltimore Luggage, supra* note 9 (Union won by 96 to 46), *with Schapiro & Whitehouse, supra* note 9 (holding assumed that union won by one vote). The union's majority in *Bancroft* was 56%.

**20.** *See Baltimore Luggage, supra* note 9.

**21.** We dealt with this type of challenge by an employer in *Bancroft, supra,* in a context ironic in retrospect. The employer there charged that the same union involved in the case before us

discriminated against *blacks,* and so, under the *Mansion House* rationale, was undeserving of certification. In support of that allegation, the *Bancroft* employer had cited only a Seventh Circuit Case adjudging two Illinois construction locals of the same union guilty of racially discriminatory practices, and a magazine article accusing some other construction locals of similar offenses.

We noted that *Mansion House* and *Bekins* dealt with discriminatory practices by specific

The analytical basis for *Mansion House* and *Bekins* is the notion that the enforcement mechanisms of the Board and the courts could not, consistent with constitutional requirements of equal protection, be made available to racially discriminatory unions.[22] As this Court stated in *Local No. 12, United Rubber, Cork, Linoleum & Plastic Workers of America, AFL–CIO v. N.L.R.B.*, 5 Cir. 1966, 368 F.2d 12, 17:

> Indeed, the Supreme Court has indicated that any statute purporting to bestow upon a union the exclusive right to represent all employees would be unconstitutional if it failed to impose upon the union this reciprocal duty of fair representation.

*See Steele v. Louisville & N.R.R.*, 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; *Wallace Corp. v. N.L.R.B.*, 1944, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216. *See also Humphrey v. Moore*, 1965, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370; *Syres v. Oil Workers Int'l. Union*, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785, *rev'g mem.*, 5 Cir. 1955, 223 F.2d 739.[23]

The same considerations giving rise to the union's duty of fair representation support the *Bekins* and *Mansion House* procedures whereby the Board is to consider, at the prompting of an employer's objection, whether a union has shown such a "propensity to fail fairly to represent employees," because of racial discrimination, that the union should not be certified. We agree that this can be a proper issue for the Board to consider in certification proceedings or as an affirmative defense in a refusal to bargain proceeding against an employer.

We further note, however, that the standard for a *prima facie* showing of racial discrimination in these contexts should be a demanding one. As the Board stated in *Bekins:*

> It will thus be our task, on a case-by-case basis, to determine whether the nature and quantum of the proof offered sufficiently shows a propensity for unfair representation as to require us, in order that our own action may conform to our constitutional duties, to take the drastic step of declining to certify a labor organization which has demonstrated in an election that it is the choice of the majority of employees. It is not our intention to take such a step lightly or incautiously, nor to regard every possible alleged violation of Title VII, for example as grounds for refusing to issue a certificate. There will doubtless be cases in which we will conclude that correction of such statutory violations is best left to the expertise of other agencies or to remedial orders less

---

locals, and that "[n]either case stands for the propositions that discriminatory membership practices in a single local necessarily infects an entire international or that discriminatory practice by an international must taint each of its locals." 516 F.2d at 446. We held that since the employer had failed to come forward with evidence or allegations that the particular local had engaged in such practices, the Company had "failed to raise a *prima facie* defense under *Mansion House* and *Benkins*," *Id.* at 447.

In the instant case, by contrast, the Company has alleged that this specific local has demonstrated an anti-white bias. We do not consider in this case whether and how equal protection analysis might differ when whites rather than blacks are alleged to be the victims of discrimination.

**22.** Equal protection requirements are implicit in the Fifth Amendment's due process clause, and thus are binding on the federal government as well as the states. *See Bolling v. Sharpe*, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884.

Governmental entities cannot, consistent with equal protection, enforce or support the practice of private invidious discrimination, *Shelley v. Kraemer*, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161.

**23.** Judge Rives, in his dissent from the original panel decision in *Syres*, observed:

> [I]t seems to me to follow as a necessary consequence, if the law provides automatic sanctions for the observance of the contract, then there can be no discrimination based on race or color. All men are entitled to the equal protection of the law and, except as punishment for wrongdoing, the law will not lend its aid to keep any man down, or to prevent his advancement or promotion. *Id.* at 745.

223 F.2d at 745. For the decision on remand from the Supreme Court, see 257 F.2d 479, 5 Cir. 1958.

draconian than the total with holding of representative status. To reconcile these views with a full awareness of our own constitutional responsibilities will, we recognize, not always be an easy task, but the difficulties involved do not entitle us to shrug off our oath to uphold and defend the Constitution of the United States.

211 NLRB at [1974 CCM NLRB at 34, 451–52] (emphasis in original).

 Implicit in that statement is a factor that cannot but weigh in our analysis—the Company's argument would have more conclusive tenability if asserted by white members or non-members in a different procedural context. Because individual employees who believe that they have been victims of racial discrimination practiced by a union have remedies under Title VII, *see* 42 U.S.C. § 2000e–2(c), or through unfair labor practice complaints, *see Local No. 12, supra,* the "drastic step" of refusing to certify a union should be taken only in response to a strong demonstration the union has in fact engaged in a pattern of racially discriminatory practices, and is likely to continue such practices. For the issue before us, this standard must be modified by the general standards discussed above regarding requirements for a *prima facie* showing sufficient to warrant a hearing. Accordingly, this Court will deny enforcement of a Board order on the grounds that the Board improperly refused a hearing on whether the union was racially discriminatory only when the employer has proffered specific evidence sufficient to demonstrate a pattern of racially discriminatory behavior by the Union which would support a finding of a definite propensity for racially unfair representation.

 The evidence cited by the Company on this issue was substantially identical to the evidence discussed above in relation orientation of the campaign. The Company also notes one post-election incident, in which an all black bargaining committee of the Union is alleged to have complained to the Company about the demotion of a black employee whose former job was given to a white.

As discussed above, the relative (but not absolute) exclusion of whites from the campaign is disturbing, but is not a sufficient ground upon which to conclude that the Union is anti-white. We determined that the Union's campaign rhetoric cited by the Company as engendering "racial hatred" could not be so characterized. Rather, the Union's propaganda was directed at connecting the desire for economic betterment among blacks, as an historically disadvantaged group, with the traditional promises of unionism. The Union campaign did not attempt to set blacks against whites, and there was insufficient evidence of official Union action to indicate the Union would represent blacks to the detriment of whites. The one grievance confrontation alluded to clearly would be insufficient to establish the sort of pattern of discrimination necessary before the drastic step of refusing to certify a Union victorious by 156 votes to 77 would be appropriate.

We conclude, therefore, that the Board did not err in refusing to hold a hearing on the issue of the Union's alleged racial discrimination.

As we have noted above, we do not by any means condone all of the actions and omissions on the part of the Union in the course of this campaign. Mindful of the 156–77 margin and the elusiveness of the "laboratory conditions" ideal, however, we have determined that the Board's refusal to overturn the election was supported by substantial evidence. As to the more general claim of racial discrimination on the part of the Union, we are disturbed by some of the evidence, but, viewing all of it, cannot find error in the Board's action. The availability of alternative remedies to individual employees victimized by discrimination reinforces our decision.

The issues in this case have been presented to us in black and white, but no such easy contrasts have been available to help us in the intellectually perilous duty of drawing lines. The tautness of the issues here makes us more respectful of the daily

unraveler of these problems—the N.L.R.B. These laborious wars never cease. Our function of appellate review gives us opportunities to view the election cauldrons with reflection and perspective, but we still must admit that specificity of the rules of war is missing and violations of the rules may be difficult to evaluate. In the end, we must rest our faith in the ability of workers, apprised of the positions of both sides on all the issues, to see through puffery and hyperbole and to vote their own best interests. The Board's order that the Company bargain on request with the Union, which won this election almost four years ago, is hereby ENFORCED.

ENFORCED.