**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BANCROFT MANUFACTURING COMPANY, INC., and Croft Aluminum Company, Inc., et al., Respondents.**

No. 74–3052.

United States Court of Appeals, Fifth Circuit.

July 23, 1975.

Rehearing and Rehearing En Banc Denied Oct. 10, 1975.
See 520 F.2d 1406.

438

Elliott Moore, Deputy Assoc. Gen. Counsel, Paul J. Spielberg, Atty., N.L. R.B., Washington, D.C., Charles M. Paschal, Jr., Director, Region 15, N.L.R.B., New Orleans, La., for petitioner.

Gordon E. Jackson, W. Kerby Bowling, Memphis, Tenn., John H. White, Jr., McComb, Miss., for respondents.

Before GOLDBERG, CLARK and GEE, Circuit Judges.

GOLDBERG, Circuit Judge:

█ Bancroft Manufacturing Company, Inc. [the Company] produces various aluminium products at three plants in and around McComb, Mississippi. On July 1, 1971, the National Labor Relations Board conducted a union representation election at the three facilities; 361 Company employees voted to be represented by the Southern Council of Industrial Workers, United Brotherhood of Carpenters & Joiners of America, AFL–CIO [the Union], and 286 employees voted against the Union.[1] Although the NLRB certified the Union as the employees' bargaining representative, the Company made timely objection to alleged Union conduct affecting the election results and has consistently refused to bargain with the Union. After nearly three years of procedural skirmishing, including an evidentiary hearing before an administrative law judge, the NLRB found that the Company's refusal to bargain was unjustified and constituted a violation of sections 8(a)(5) and (1) of the National Labor Relations Act.[2] 1973, 210 NLRB No. 90. Now, almost four years after the election, the Board asks us to enforce a bargaining order against the Company. We have carefully examined the record and have decided that substantial evidence supports the Board's determination that the election results correctly reflected the free and reasoned choice of a majority of the employees of the bargaining unit. This is a close case, but in the absence of absolute certainty, we turn to the certitude of the administrative law judge and the Board, whose findings enable us to conclude that enforcement shades denial; the Board's order will be enforced.

█ Before we begin our discussion of the particulars of this case, we must remind ourselves that the burden of proof of unfairness in representation elections is on the complaining party, N.L.R.B. v. Mattison Machine Works, 1961, 365 U.S. 123, 81 S.Ct. 434, 5 L.Ed.2d 455; N.L.R.B. v. Con-Pac, Inc., 5 Cir. 1975, 509 F.2d 270; N.L.R.B. v. White Knight Mfg. Co., 5 Cir. 1973, 474 F.2d 1064; Bush Hog, Inc. v. N.L.R.B., 5 Cir. 1969, 420 F.2d. 1266, and that the Board's long and varied experience in representation matters requires us to give special respect to its decisions as to whether given conduct reasonably tended to interfere with the employees' free choice.[3] N.L.R.B. v. Leatherwood Drilling Co., 5 Cir. 1975, 513 F.2d 270; N.L.R.B. v. Muscogee Lumber Co., Inc., 5 Cir. 1973, 473 F.2d 1364; N.L.R.B. v. Golden Age Beverage Co., 5 Cir. 1969, 415 F.2d 26. As long as the NLRB's decision is reasonable and based upon substantial evidence, we must enforce its order, even though we might have taken a different view had the case come before us as an original matter. 29 U.S.C. § 160(f); Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456, 469; T.I.M.E.—DC, Inc. v. N.L.R.B., 5 Cir. 1974, 504 F.2d 294, 299–300. With these decisional guidelines in mind, we turn to the substance of the Company's complaints.

1. Three ballots were void and thirty-two were challenged; the latter were not counted because they were too few to affect the election results. Since there were 674 employees eligible to vote, and since the total of pro-union, anti-union, void and challenged ballots comes to 679, it seems that almost every eligible voter and a few ineligible voters voted.

2. Board orders concerning representation matters are reviewable only as they are drawn into question by a petition for enforcement or review of a Board order made under section 10(c) of the Act to restrain an unfair labor practice. 29 U.S.C. § 159(e) and (f); see Bishop v. N.L.R.B., 5 Cir. 1974, 502 F.2d 1024.

29 U.S.C. § 158 provides, in pertinent part:
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . .

(5) to refuse to bargain collectively with the representatives of his employees.

3. For a thorough and thoughtful discussion of the problem of campaign tactics and employee free choice, see Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv. L.Rev. 38 (1964).

## I

Forty-three percent of the Company's workforce at the time of the election were black people, so that much of the Union's organizing effort was devoted to convincing the blacks that their interests would best be served by choosing the Union to represent them. The Company contends that the Union's actions in this regard amounted to an inflammatory appeal to racial passion which caused the very large number of black employees to vote for the Union on the basis of racial considerations alone. The major support for this theory is provided by the Board's finding that Union organizer Sylvester Hicks, a black man, warned black employees on several occasions that "if the blacks did not stay together as a group and the Union lost the election, all the blacks would be fired." Furthermore, in response to employee questions about layoffs, Hicks warned that "seemingly the trend was . . . that the blacks were going to be laid off if they didn't stick together and try to get the plant organized to where they would have some protection. . . ." Finally, a rumor had it that the Company would give an automobile to a friendly black employee, J. C. Butler, if Butler helped to swing the black vote. At a meeting attended by a large number of white and black employees, Rev. Harry Buie, a black minister employed by the Delta Ministry (an anti-poverty organization) and invited by the Union to assist in the campaign, commented on this rumor by lamenting that "it had been called to his attention that an employee was to be given a car to swing the black vote. He understood that he was a soul brother and the part that hurt him so bad was that it would be a sold out soul brother."

The Company complains that the remarks of Hicks and Buie were grossly inaccurate and were calculated to instill in the black employees the conviction that their employer held blacks in low esteem and intended to discriminate against them in an invidious manner. The racially-oriented propaganda, the Company contends, was so likely to impair the blacks' capacity for a reasoned decision that the election must be set aside. The administrative law judge found, however—and the Board agreed—that these remarks were unimportant and not unreasonable in the particular situation, and that even if the statements were untrue, they had not exercised a significant influence on the results of the voting.

The NLRB first enunciated a policy for dealing with racially inflammatory remarks in representation campaigns in Sewell Mfg. Co., 1962, 138 NLRB 66. In *Sewell*, a Mississippi employer conducted a strident anti-union campaign on the theme that since the union seeking to represent its employees supported the struggle for equal civil rights for black citizens, a vote for the union was tantamount to a vote for an integrated society, a goal the employer assumed its all-white workforce rejected. When the union lost the election, it sought to have the balloting invalidated on the ground that the employer had conducted a campaign of race hate which succeeded only too well in diverting the employees' attention from the real issues at stake in the election. The NLRB Regional Director declined the union's request, on the ground that none of the statements made by the employer were alleged to be untrue, and that the charges were mere propaganda which the employees could weigh for themselves. The Board disagreed with the Regional Director and voided the election, finding that the employer had deliberately sought to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals which have no place in an election campaign. The NLRB reasoned:

> We take it as datum that prejudice based on color is a powerful emotional force. We think it also indisputable that a deliberate appeal to such prejudice is not intended or calculated to encourage the reasoning faculty.

What we have said indicates our belief that appeals to racial prejudice on matters unrelated to the election is-

sues or to the union's activities are not mere "prattle" or puffing. They have no place in Board electoral campaigns. They inject an element which is destructive of the very purpose of an election. They create conditions which make impossible a sober, informed exercise of the franchise. The Board does not intend to tolerate as "electoral propaganda" appeals or arguments which can have no purpose except to inflame the racial feelings of voters in the election.

This is not to say that a relevant campaign statement is to be condemned because it may have racial overtones. . . .

We would be less than realistic if we did not recognize that such statements, even when moderate and truthful, do in fact cater to racial prejudice. Yet we believe that they must be tolerated because they are true and because they pertain to a subject concerning which employees are entitled to have knowledge—the union's position on racial matters.

So long, therefore, as a party limits itself to *truthfully* setting forth another party's position on matters of racial interest and does not deliberately seek to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals, we shall not set aside an election on this ground. However, the burden will be on the party making use of a racial message to establish that it was truthful and germane, and where there is doubt as to whether the total conduct of such party is within the described bounds, the doubt will be resolved against him.

138 NLRB at 71–72. *See also* Universal Mfg. Corp., 1966, 156 NLRB 1459.

On the same day that *Sewell* was decided, the Board concluded that employer literature not dissimilar to that used in *Sewell* fell within permissible bounds because the statements were made in a generally temperate fashion. Allen-Morrison Sign Co., Inc., 1962, 138 NLRB 73. In this spirit, the Board has consistently approved union campaigns which stress black racial pride, the past history of discrimination against blacks in American society or the present disadvantaged status of blacks as a class, where the statements do not claim special privileges for blacks, on the theory that such statements are true and that economic issues, even racially-oriented ones, properly form the core content of representation contests. Baltimore Luggage Co., 1967, 162 NLRB 1230, enforced, 4 Cir. 1967, 387 F.2d 744; Aristrocrat Linen Supply Co., Inc., 1965, 150 NLRB 1448; Archer Laundry Co., 1965, 150 NLRB 1427. On the other hand, the Fourth Circuit has found statements comparing the union struggle in a particular plant with recent, nearby incidents of racial violence to be sufficiently inflammatory to fall within the prohibition of *Sewell*. N.L.R.B. v. Schapiro & Whitehouse, Inc., 4 Cir. 1966, 356 F.2d 675.

■ The racially-oriented remarks here do not fall within the ambit of any previous application of the *Sewell* doctrine.[4] Thus, we begin our discussion of

---

4. We have found only three reported cases in which black employees have been told that they will be fired or laid off if the union loses the election. In Kresge-Newark, Inc., 1955, 112 NLRB 869, a union organizer allegedly made such a statement, and although the Regional Director found no evidence to support the employer's allegation, the Board ruled that the statement would not have been objectionable even if it had been made, as the union was certainly in no position to effect such discharges, and that the statement "constituted at most an accusation against the Employer in the nature of campaign propaganda which the employees were capable of evaluating. . . ."

112 NLRB at 871. The continuing vitality of *Kresge-Newark* would seem to be in serious question since *Sewell*, for the statements in question were certainly untrue and, because of their racial nature, may have worked acute prejudice upon the employees' reasoned consideration of the employer's position in the election. In Hobco Mfg. Co., 1967, 164 NLRB 862, there was a rumor that if the union were to lose the election, all the black employees would be replaced by whites, but no evidence was presented linking the rumors to union agents; in fact, the union organizers attempted to refute the rumor. The Board found that the employer's failure to establish a sufficient

this particular problem by noting that *Sewell* requires the party making a racially-oriented statement to demonstrate the truth of the statement, and we believe that the Union has failed to discharge that burden here. Union Organizer Hicks based his comments on the possibility of discriminatory discharges or layoffs of blacks on the fact that several recent layoffs had affected many more blacks than whites, and on his belief that the percentage of blacks in the workforce had recently declined from 38% to 34%. In fact, the layoffs were apparently made on the basis of seniority and the proportion of black employees remained near 43% at all times relevant to our inquiry. In other words, there is no evidence that the Company intended to or did in fact treat its black employees unfairly. With respect to Buie's comment about the "sold out soul brother," the most that can be said for it is that the accusation was based on second- or third-hand hearsay, that Buie did not attempt to verify the accuracy of the rumor before making his accusations, and that employee Butler eventually *purchased* an automobile from the Company, apparently at near-market value, as he had done once several years before this representation campaign.

The Board decided that Hicks' statements about mass black firings were not really false but were instead reasonable predictions of future events based on the Company's recent history of layoffs. The problem with this reasoning is that however plausible or commonplace the statements may have been, the fact remains that Hicks and Buie were wrong, and that their comments could have led black employees to infer that the Company would discriminate against them although there was no evidence to support such a conclusion. This is not a case, as Baltimore Luggage Co., *supra*, and Archer Laundry Co., *supra*, were, in which union organizers tell black employees that (white) employers in general have tended to discriminate against blacks; this is a case where the employees were told that *their* employer discriminated against *them* in a particular fashion.

■ Where racial remarks are injected into an election contest, but do not form the core or theme of the campaign as they did in *Sewell*, the court's analysis of their effect should follow a two-step process. First, were the statements racially inflammatory? If they were, then the test for truth and relevancy must be made as *Sewell* describes. Second, if the remarks were not racially inflammatory, then the statements should be reviewed under the familiar standards applied to any other type of alleged material misrepresentation.

■ Turning to the case at bar, we find substantial evidence to support the determination of the administrative law judge and the Board that the disputed statements did not so taint the campaign with racial passion as to make a fair election impossible. Hicks and Buie voiced pro-Union and pro-black protection sentiments, but they certainly did not project a black versus white dichotomy. This campaign was waged in a bargaining unit which was 57% white and 43% black. As a matter of common sense, any attempt by the Union to set black against white would have been suicidal, for the Union could successfully organize these plants only by forging a harmonious racial amalgam. It is certainly possible that a union might fail to see its own best interests, but there is no evidence here that the Union told blacks that they ought to dominate the Union or enjoy benefits unavailable to their fellow workers. There is no evidence that the Union sought to incite blacks against whites; at no time were there either acts or threats of inter-racial violence, and there is certainly nothing to indicate

nexus between the rumor and the union was fatal to the employer's *Sewell*-based objections. Finally, in N.L.R.B. v. Staub Cleaners, Inc., 2 Cir., 1969, 418 F.2d 1086, cert. denied, 1970, 397 U.S. 1038, 90 S.Ct. 1357, 25 L.Ed.2d

649, there were rumors similar to those in *Hobco*, but the Board found—and the Second Circuit agreed—that a combination of union disavowals and employer rebuttals had effectively neutralized the rumors.

that the black employees were less favorably disposed toward the Company than were their white co-workers, either before or after the remarks in question. In this case there was no racially-oriented campaign; the vast bulk of the literature on both sides was devoted to the economic issues ordinarily found in representation contests: whether the Union or the Company would ensure the highest wages, the best pension plans, the firmest job security. The NLRB found Buie's remarks to be nothing more than the sort of inter-employee squabbling that so often occurs in campaigns.

The next step is to review the record to determine if racial inflammation resulted from the interjection of these remarks. Both the administrative law judge and the Board concluded that none of the disputed statements could be characterized as racially inflammatory. We agree. The statements of Hicks and Buie were neither variations on a Union theme nor attempts to incite racial passions. Rather, they were more in the nature of asides addressed to a particular group of employees in the context of a campaign aimed at securing the adherence of all employees to the Union. Although we cannot condone the Union's somewhat cavalier attitude toward truth in the sensitive area of race relations, this record does not disclose that the disputed statements had an inflammatory effect on the black employees.

■ This then leads us to the second step of the process required here. The Union made material misrepresentations of fact during the campaign, hence we must decide whether the election must be set aside on that account. In Hollywood Ceramics, 1962, 140 NLRB 221, the NLRB adopted a four-pronged test for evaluating questionable campaign communications which we have applied in numerous cases, see, e. g., United Steelworkers of America, AFL–CIO v. N.L.R.B., 5 Cir. 1974, 496 F.2d 1342, 1345; N.L.R.B. v. Muscogee Lumber Co., supra, 473 F.2d at 1368: (1) whether there has been a misrepresentation of a material fact; (2) whether the misrepresentation came from a party who was in a position to know the truth or who had special knowledge of the facts; (3) whether the other party had adequate opportunity to reply and to correct the misrepresentation; and (4) whether the employees had independent knowledge of the misrepresented facts, so that they could effectively evaluate the propaganda. This standard has generally been utilized by balancing the last three factors, once the threshold question of whether there has been a material misrepresentation has been answered in the affirmative.

■ We have already determined that the statements of Hicks and Buie were material misrepresentations, thus satisfying the first requirement and we will assume arguendo that the employees had no independent knowledge either of the discharge-layoff situation or of the circumstances surrounding employee Butler's purchase of an automobile from the Company, so that the fourth criterion is also weighted against the Union. On the other hand, neither the Union in general nor Hicks in particular were in a position to know the Company's future plans regarding layoffs or discharges. Even if the racial import of Hicks' charges lent to his statements a persuasive force which they would not otherwise have had, Hicks admitted at the time that he was basing his allegations in part upon an extrapolation of past trends, so that we cannot say that the Board was unreasonable in its determination that the employees most likely regarded the statements only as slightly credible Union propaganda and valued them accordingly. With respect to Buie's remarks, Hicks immediately asked several employees to check the accuracy of the rumors, thus considerably diminishing the impact of Buie's comments, and nothing more was said by any Union agent regarding employee Butler and his automobile-to-be. In sum, the second factor in our calculus weighs against the Union, but not decisively.

Of controlling importance to our decision, however, is the fact that although the Company never replied directly ei-

ther to Hicks or to Buie, the Company was well aware that the Union was appealing to the racial pride of its black employees, and the Company attempted to rebut those appeals in its own communications. Company literature stressed over and over again that an employee's job depended solely on his or her own efficiency and the Company's ability to compete in the industry. Company fliers were replete with magazine and newspaper articles chronicling union discrimination against blacks in all parts of the nation. The Company's president personally made a strong plea for employee loyalty, condemning racial bigotry, reminding the employees of the Company's fair labor policies, and expressing both his displeasure at the Union's mention of racial issues ("I don't know of anything that a man can do that is dirtier than this.") and his satisfaction that "our black employees are not being fooled by this talk." These vigorous Company rejoinders offered the employees an opportunity to view the Hicks and Buie remarks in the context of avowal and denial in which representation elections are customarily conducted. These rebuttals and the Union's adequate margin of victory (56% of the vote) convince us that the Board did not abuse its broad discretion in representation matters by finding that the Company had failed to show that the Union's statements so lowered the tone of the campaign that the free choice of a majority of the employees cannot be determined from the election results. See N.L.R.B. v. Golden Age Beverage Co., supra, 415 F.2d at 31; N.L.R.B. v. Houston Chronicle Publishing Co., 5 Cir. 1962, 300 F.2d 273, 278; N.L.R.B. v. Staub Cleaners, Inc., supra, 418 F.2d at 1089.[5]

## II

■ The Company makes several other objections to Union and Board conduct; we will discuss each in turn.

First, the Company complains that the Union offered to waive initiation fees for all employees who would sign authorization cards before the election, in violation of the rule in N.L.R.B. v. Savair Mfg. Co., 1973, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495, where the Supreme Court decided that such an action was impermissibly coercive. The problem with the Company's argument is that the record shows that the Union made an unqualified promise to waive initiation fees for all employees, including those who declined to join the Union until after the election. This even-handed Union conduct is certainly not the sort of pressure tactic that Savair meant to discourage, see N.L.R.B. v. Benner Glass Co., 5 Cir. 1975, 514 F.2d 641; N.L.R.B. v. Con-Pac, Inc., supra, and the Board correctly concluded that the Company could not prevail on this theory.

■ Second, the Company charges that the Union threatened pro-Company employees with physical violence and the loss of their jobs in the event of Union victory. Eight employees testified that they personally were threatened or that they heard rumors of possible retribution against pro-Company employees. Only one witness, however, testified to a direct threat by a Union agent (Hicks) in connection with the election, and the administrative law judge credited Hicks' denial thereof. We are bound by the hearing officer's credibility resolution, Armstrong Rubber Co. v. N.L.R.B., 5 Cir. 1975, 511 F.2d 741; T.I.M.E.—DC, Inc. v. N.L.R.B., supra, and even if all the other testimony presented by the Company is taken as true, that evidence was only of random rumors and threats not attributable to the Union and thus not entitled to the same weight as evidence of Union-directed threats would be. See United Steelworkers of America, AFL–CIO v. N.L.R.B., supra; N.L.R.B. v. White Knight Mfg. Co., supra. In these cir-

---

5. The Company also charges that the Union made various other material misrepresentations of fact regarding Company charitable contributions and state and federal government support of labor unions. We agree with the Board that each of these various statements was either true or innocuous or both, and that the asserted abuses offer no basis for setting aside the election.

cumstances, we believe that the Board justifiably concluded that the alleged misconduct was neither so aggravated nor so pervasive as to require the invalidation of the election.

Third, the Company argues that the conduct of the Board official in charge of the balloting was improper, in that the agent refused to allow certain employees to vote and discouraged many other employees from attempting to vote by his rude and belligerent behavior. Much of the Company's evidence on this matter comes from the testimony of ten employees who were ineligible to vote because they had not been both employed *and* working on the eligibility cut-off date. The Board agent properly told these people that they were not permitted to vote; when they persisted, the official allowed them to cast challenged ballots. The administrative law judge found that only four or five employees were prevented from voting, and he concluded that the outcome of the election could not have been affected thereby. There is nothing here to mandate a new election.

### III

Finally, the Company contends that the NLRB failed to provide it with a full, fair and proper hearing in two respects: 1) the Board adjudicated this matter in an unfair labor practice hearing instead of in a representation proceeding; and 2) the Board refused to allow the Company to discover or to submit evidence that the Union discriminates against blacks and thus is unfit to represent the black employees in the bargaining unit. A consideration of the first objection will require a brief recitation of the protracted procedural history of this case.

After the ballots had been counted and the Company had filed its objections to Union conduct, the NLRB Regional Director made an *ex parte* investi-

gation pursuant to 29 C.F.R. § 102.69, determined that none of the Company's allegations were meritorious and certified the Union on October 20, 1971. As we have seen, the Company refused to bargain with the Union, so the Regional Director filed an unfair labor practice complaint against the Company on March 10, 1972; the Board entered summary judgment against the Company on June 2, 1972, and ordered the Company to bargain. 197 NLRB No. 39. The Company and the Board then filed petitions in this Court for review and enforcement, respectively, of the bargaining order. While these petitions were pending, the NLRB's General Counsel concluded that some of the Company's objections raised substantial and material issues of fact which should be resolved by a hearing, and the Board granted a joint motion to vacate its order on January 3, 1972, remanding the case to the Regional Director for "further appropriate action."[6] The Regional Director then instituted an unfair labor practice [ULP] hearing before an administrative law judge, who found no merit in the Company's defenses and ruled on June 7, 1973, that it had wrongfully refused to bargain in violation of section 8(a)(5) of the Act. The Board affirmed the administrative law judge's decision and once again ordered the Company to bargain with the Union.

The Company argues that the Regional Director's decision to hold a hearing in the form of a ULP proceeding instead of a representation proceeding violated its right to constitutional due process. The Company insists that although the ULP hearing afforded it the opportunity to present evidence and cross-examine opposing witnesses, provided it the protection of the rules of evidence used in the federal district courts, and placed the burden of proof on the General Counsel, yet a representation hearing—which offers none of these advantages—would somehow have

---

6. The Board has discretion to modify or set aside an order at any time before filing the record of the case in the Court of Appeals for enforcement, so long as the interested parties are given "reasonable notice". 29 C.F.R. § 102.49; *see* N.L.R.B. v. Con-Pac, Inc., *supra*, 509 F.2d at 273.

been more "fair" because the NLRB's General Counsel would have been a neutral party instead of an adversary one. We are at a loss to understand the logic of this position, for it seems clear that the ULP hearing boasts all of those procedural safeguards ordinarily associated with the concept of due process. Although this Court has often ruled that due process requires that a party charged with an unfair labor practice be given a hearing at some point where "substantial and material issues of fact" are raised, see N.L.R.B. v. Golden Age Beverage Co., supra; Tyler Pipe & Foundry Co. v. N.L.R.B., 5 Cir. 1969, 406 F.2d 1272; United States Rubber v. N.L.R.B., 5 Cir. 1967, 373 F.2d 602; see also 29 C.F.R. § 102.69(f), we have never prescribed any particular form for such a hearing, and we conclude that the ULP hearing here afforded the Company due process. See N.L.R.B. v. Commercial Letter, Inc., 8 Cir. 1974, 496 F.2d 35, 38.

The Company's second procedural objection stems from its contention, based on N.L.R.B. v. Mansion House Center Management Corp., 8 Cir. 1973, 473 F.2d 471, that the Union's certification must be revoked because its alleged practice of racial discrimination has rendered it unfit to represent the Company's black employees. When the Company issued a subpoena duces tecum for statistical data concerning the Union's racial composition and related matters, and moved to amend its answer to the ULP complaint to include the Mansion House defense, the administrative law judge revoked the subpoena and denied leave to amend. The Company appealed these rulings to the Board, which concluded that no prima facie case of discrimination had been made out and so denied the appeal. The Company now urges that the actions of the administrative law judge and the Board deprived it of the opportunity to present a complete defense to the ULP charges. against it.

■ In Mansion House, the Eighth Circuit refused to enforce a Board order requiring an employer to bargain with a union local which had discriminatory membership policies, on the ground that the NLRB, as an agency of the federal government, cannot be allowed to be "a willing participant in the union's discriminatory practices." 473 F.2d at 473. The Board subsequently adopted the Mansion House rule in Bekins Moving & Storage Co., 1974, 211 NLRB No. 7, holding that since the Fifth Amendment "forbids the participation in, and the actual practice of, invidious discrimination by the Federal Government," the NLRB has no constitutional power to confer representation certificates upon unions which practice racial discrimination. Both Mansion House and Bekins dealt with union discrimination at the local level only, and it is clear that it is the local unit with which the rule of those cases is ordinarily concerned, for it is the local—and not the regional or international union organization—which usually bargains with employers and is charged with fair representation of all its members in its dealings with management. See Grant's Furniture Plaza, Inc., 1974, 213 NLRB No. 80; Williams Enterprises, Inc., 1974, 212 NLRB No. 132. Neither case stands for the propositions that discriminatory membership practices in a single local necessarily infects an entire international or that discriminatory practices by an international must taint each of its locals.

■ In this case, the Company is hardly in a position to contend that the local union organization in its plants discriminates against blacks, considering its allegations that the Union paid all too much attention to organizing black employees during the campaign. Instead, the Company argues that since the Union here is a branch of the Southern Council of Industrial Workers, United Brotherhood of Carpenters & Joiners of America, AFL–CIO, and since the Carpenters are allegedly notorious for their discriminatory membership policies, this local's certification must be revoked. Armed with this rationale, a 1972 federal court decision, United States v. United Brotherhood of Carpenters & Joiners of America, Local 169, 7 Cir. 1972, 457 F.2d

210, adjudging two Illinois construction locals guilty of racially discriminatory membership practices, and a magazine article accusing some Carpenters' construction locals of similar offenses, the Company issued a subpoena *duces tecum* for:

> Records of the Carpenter's Union that indicate the numbers of blacks that hold office and are employed as Representatives, Officers or Officials on a full time basis by the Carpenter's Union, as compared to the number of whites performing the same duties. Also, total membership of the Carpenter's Union with a breakdown on white and black number percentages by State.

A cursory glance at the subpoena indicates that the vast and vague parameters of the Company's allegations were exceeded only by the projected scope of discovery. Furthermore, the information advanced by the Company in support of its request was insufficient and largely irrelevant. We have seen that *Mansion House* and *Bekins* were concerned primarily with discriminatory membership and representation policies at the local level, hence, it would be logical to assume that the Company would have come forward with at least some evidence or allegation that this particular local engages in such practices. The Company did not do so; rather, it sought to tie the membership practices of an industrial local in Mississippi to those of construction locals in Illinois. Moreover, although the Company asked for the records of the Union's international and regional organizations, it failed to establish or even to allege any nexus between policies at the international and regional levels and policies at the local level. In these circumstances, we conclude that the Company failed to raise a prima facie defense under *Mansion House* and *Bekins,* and we hold that the Board did not abuse its discretion in refusing to enforce the subpoena or to allow the amendment of the Company's answer.

### IV

In summary, four years after a considerable majority of the employees in the Company's plants voted that the Union should represent them for collective bargaining purposes, we enforce an NLRB bargaining order against the Company. Although it is clear that the Union made occasional crude and unjustifiable remarks during the course of the campaign, and although the Board's subsequent disposition of the Company's objections to those remarks was neither as speedy nor as efficient as it might have been, we are convinced that both the election and the investigation thereof were fair to all concerned.

Enforced.