**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CASE FARMS OF NORTH CAROLINA,
INCORPORATED,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent,

No. 96-1402

NATIONAL POULTRY WORKERS
ORGANIZING COMMITTEE,
Intervenor.

THE NORTH CAROLINA POULTRY
FEDERATION,
Amicus Curiae.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

CASE FARMS OF NORTH CAROLINA,

INCORPORATED,
Respondent.

No. 96-1566

THE NORTH CAROLINA POULTRY
FEDERATION,
Amicus Curiae.

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
(11-CA-16814)

Argued: March 3, 1997

Decided: October 23, 1997

Before WILLIAMS and MICHAEL, Circuit Judges, and
GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Petition denied and order enforced by published opinion. Judge
Michael wrote the opinion, in which Judge Goodwin joined. Judge
Williams wrote a separate concurring opinion.

_____

**COUNSEL**

**ARGUED:** David Parks Hiller, MILLISOR & NOBIL, Columbus,
Ohio, for Petitioner. David A. Seid, NATIONAL LABOR RELA-
TIONS BOARD, Washington, D.C., for Respondent. Laurence
Edward Gold, Washington, D.C., for Intervenor. **ON BRIEF:** Freder-
ick L. Feinstein, General Counsel, Linda Sher, Associate General
Counsel, Aileen A. Armstrong, Deputy Associate General Counsel,
Frederick C. Havard, Supervisory Attorney, NATIONAL LABOR
RELATIONS BOARD, Washington, D.C., for Respondent. Theodore
T. Green, Washington, D.C., for Intervenor. Kevin Sturm,
EDWARDS, BALLARD, BISHOP, STURM, CLARK & KEIM,
P.A., Spartanburg, South Carolina, for Amicus Curiae.

_____

**OPINION**

MICHAEL, Circuit Judge:

Case Farms of North Carolina, Inc. petitions for review of a
National Labor Relations Board order certifying the results of a union
representation election held July 12, 1995, at the Case Farms poultry
processing plant in Morganton, North Carolina. Case Farms contends
that the election was irrevocably tainted by what it perceives as an

2

appeal to "ethnocentric fears" made in a flier distributed by the National Poultry Workers Organizing Committee, Affiliated with the Laborers' International Union of North America, AFL-CIO (the Union). The Board overruled the company's objections to the election and now seeks to enforce an order requiring Case Farms to recognize and bargain with the Union. Because the Board was within its discretion in overruling Case Farms' objections, we deny the company's petition for review and enforce the Board's order.

I.

Case Farms operates a poultry processing plant in Morganton, North Carolina. Roughly eighty percent of the 514 plant employees who were eligible to vote in the representation election were Latino, and of the Latinos, ninety percent were Guatemalan. More than seventy percent of the eligible employees were aliens.

On May 15, 1995, approximately 200 employees at the Morganton plant began a work stoppage to protest wages and working conditions. The protesting employees "form[ed] in front of the plant," where they remained for about an hour until they were asked to leave. J.A. 67. Three of these employees were arrested, however, apparently at the instance of Case Farms. On that first day the employees presented the company with a petition outlining their grievances, which included claims that Case Farms was paying low wages, refusing sufficient bathroom breaks, speeding up the chicken (production) line, threatening employees who sought medical attention, charging employees for certain equipment, and firing employees who registered complaints. The protesting employees later obtained a parade permit and had a "demonstration parade in front of the plant" on the third day, May 17, 1995. J.A. 67. The work stoppage ended on May 18.

Soon thereafter the Union began an organizing campaign at the plant. As part of its campaign, the Union distributed at least twelve different leaflets, most printed in English and Spanish. One of the leaflets read as follows:

> **Case Farms Doesn't Care!**
>
> This year they had three people arrested.

3

Two years ago they had 50 people arrested.

In Ohio, two years ago Case Farms fired the entire Amish workforce, and replaced them with Latinos.

They did this to the Amish after years of loyal service.

Why?

Because they could pay Latinos less and treat them worse.

They care more about the **chickens** than any of their workers.

How are we going to prevent Case Farms from treating us like the Amish?

If We Want Case Farms to Treat Us with Dignity and Respect Then We Must **Unite for Change -- Vote Union YES**

J.A. 304 (bold in original) (hereinafter Amish flier). The Amish flier was also distributed in Spanish.**1** Other fliers decried current working conditions, compared Case Farms unfavorably with other poultry processors, and argued that the Union would improve the workers' situation.

On July 7, 1995, five days before the election, Jesyka Martinez, a Case Farms employee who was against the Union, got involved in a heated argument with union organizers. According to the organizers, whose testimony was credited by the Board's hearing officer, Martinez came out of the plant after work and took a leaflet from one of them. She then crumpled the leaflet, threw it to the ground, and pulled aside two of the union organizers. Martinez told the organizers that

---

**1** According to testimony by a Case Farms witness, the Spanish version differed from the English version. While the English version states that Case Farms fired the entire Amish work force, the Spanish version allegedly states that "Case Farms fired all the workers, [and only] some of them w[ere] Amish." J.A. 131 (testimony of Jaime White).

4

the Union was only there to cause problems. The organizers told Martinez they could not talk to her right then because they were handing out leaflets, but they would like to talk to her at another time. Martinez got into her car and left. Ten minutes later she returned and began yelling at the departing workers, telling them that the Union was just there to take their money. She told the workers not to take the Union leaflets and jerked leaflets out of the hands of some of the workers. One of the organizers then asked Martinez why, if she really cared about the workers, she had said the day before that the Guatemalan employees were "nothing but lazy bums" and "when they don't do the job, she had to do the job for them." J.A. 220. By this point a crowd of workers had gathered; estimates on the number range from forty to 300. Compare J.A. 230 (testimony of union organizer Elias Martinez) (estimating 40 to 50 people) with J.A. 171 (testimony of Jesyka Martinez) (claiming 270 to 300 people). Martinez denied making the comments and began to argue with some of the assembled workers. The police were eventually called to the scene and escorted Martinez to her car.

The representation election was held on July 12, 1995, and the Union won by a vote of 238 to 183. Case Farms filed seven objections to the election, and an extensive hearing was held to resolve the issues of fact relating to those objections. After the hearing, the Board's hearing officer issued a report finding "that the Union did not engage in objectionable conduct" and recommending that Case Farms' objections be overruled. J.A. 343. The Board adopted the hearing officer's findings and recommendations and certified the Union as bargaining representative for the employees at the Morganton plant.

In order to obtain judicial review of the Board's certification, Case Farms refused to bargain with the Union. The NLRB General Counsel brought an unfair labor practice claim against Case Farms based on this refusal to bargain. Case Farms defended by arguing that the Union had been improperly certified. The Board granted summary judgment against Case Farms and ordered the company to bargain. Case Farms petitioned this court for review of the Board's final order, and the Board cross-petitioned for enforcement of its order.

II.

Although Case Farms made seven objections concerning the July 12 election, its briefs to us focus on the Union's distribution of the

5

Amish flier. Case Farms claims that this flier was a misrepresentation designed to generate fear of an "ethnic cleansing" among the non-English-speaking Latino aliens, such as the one allegedly experienced by the Amish. The Board found the flier did not constitute an inflammatory appeal to race or ethnicity, and therefore the flier provided no grounds for overturning the election. In considering this, we recognize that "[t]he Board's determination regarding the validity of an election `is within the sound discretion of the Board' and `should be reversed only when [the Board] has abused its discretion.'" NLRB v. VSA, Inc., 24 F.3d 588, 592 (4th Cir. 1994) (quoting NLRB v. Manufacturer's Pkg. Co., 645 F.2d 223, 226 (4th Cir. 1981)).

The Board's stated goal in regulating the conduct of representation elections is to "provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." General Shoe Corp., 77 N.L.R.B. 124, 127 (1948), enforced, 192 F.2d 504 (6th Cir. 1951). The Board has recognized, however, that elections "do not occur in a laboratory where controlled or artificial conditions may be established" and that, accordingly, "the actual facts [must be assessed] in the light of realistic standards of human conduct." The Liberal Market, Inc., 108 N.L.R.B. 1481, 1482 (1954). This tension between the ideal and reality is evidenced by the Board's policy towards misrepresentations in campaign messages. From 1962 to 1982 the Board changed its policy concerning misrepresentations four times. See Hollywood Ceramics Co., Inc., 140 N.L.R.B. 221, 224 (1962) (holding that elections may be overturned based on last-minute misrepresentations involving a substantial departure from the truth); Shopping Kart Food Market, Inc., 228 N.L.R.B. 1311, 1313 (1977) (holding that it would no longer set aside elections based on misrepresentations); General Knit of California, Inc., 239 N.L.R.B. 619, 620 (1978) (returning to the Hollywood Ceramics standard); Midland Nat'l Life Ins. Co., 263 N.L.R.B. 127, 131 (1982) (returning to the Shopping Kart standard). In Midland the Board finally settled on the standard that "we will no longer probe into the truth or falsity of the parties' campaign statements, and that we will not set elections aside on the basis of misleading campaign statements." Id. at 133. The Board reached this holding in part in order to "remove[ ] impediments to free speech by permitting parties to speak without fear that inadvertent errors will provide the basis for endless delay or overturned elec-

6

tions." Id. at 132. The Board believed that its "`rules in this area must be based on a view of employees as mature individuals who are capable of recognizing campaign propaganda for what it is and discounting it.'" Id. at 132 (quoting Shopping Kart, 228 N.L.R.B. at 1313).

Case Farms takes great pains to establish that it did not fire Amish workers from its Ohio plant, contrary to the claim of the Amish flier. Although Case Farms acknowledges that virtually all of the Amish workers had left its Ohio plant, the company asserts that the Amish quit their jobs voluntarily. This assertion is unrebutted by the Union. Midland, however, established that the truthfulness of campaign propaganda is generally irrelevant, and Case Farms implicitly admits that the election cannot be overturned solely because there is a false statement in the Amish flier. See Reply Brief for Petitioner at 8-10. Instead, the company argues that the Board has created an exception to the Midland rule when the propaganda at issue, in addition to being untruthful, appeals to "ethnocentric fears."

In Sewell Mfg. Co., 138 N.L.R.B. 66, 70 (1962), the Board established that "a deliberate, sustained appeal to racial prejudice" could create conditions that "made impossible a reasoned choice of a bargaining representative." During the representation campaign in Sewell held in 1961, the employer distributed literature linking the union to the NAACP. One of the employer's fliers pictured a white man, identified as a union leader, dancing with a black woman. Underneath the picture was a story entitled: "Race Mixing Is An Issue As [Company] Workers Ballot." Id. at 67. The Board set aside the election after finding that "the Employer's propaganda directed to race exceeded permissi[ble] limits and so inflamed and tainted the atmosphere in which the election was held that a reasoned basis for choosing or rejecting a bargaining representative was an impossibility." Id. at 72.

The Board recognized, of course, that matters of race and ethnicity will often be important to a representation campaign. It therefore held that "[s]o long . . . as a party limits itself to truthfully setting forth another party's position on matters of racial interest and does not deliberately seek to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals, we shall not set aside an election on this ground." Id. at 71-72. The Board has further affirmed and refined this standard in cases following Sewell. In Baltimore Luggage Co., 162

7

N.L.R.B. 1230 (1967), enforced, 387 F.2d 744 (4th Cir. 1967), the Board held that the Sewell standard was not violated when civil rights leaders spoke out in support of a union campaign by linking the civil rights movement to the labor movement.

> Consequently, in Sewell, we did not lay down the rule that parties would be forbidden to discuss race in representation elections. Rather, we set aside an election because the campaign arguments were inflammatory in character, setting race against race -- an appeal to animosity rather than to consideration of economic and social conditions and circumstances and of possible actions to deal with them.

Id. at 1233 (footnote omitted). The Board has made clear in the cases following Sewell that appeals to race or ethnicity must be "inflammatory" in order to violate the Sewell standard. See Englewood Hospital, 318 N.L.R.B. 806, 807 (1995) ("In these cases[following Sewell] the Board has consistently reiterated that `the rule in Sewell is applicable only in those circumstances where it is determined that the "appeals or arguments can have no purpose except to inflame the racial feelings of voters in the election."'" (quoting Bancroft Mfg. Co., 210 N.L.R.B. 1007, 1008 (1974) (quoting Sewell, 138 N.L.R.B. at 71))).

Accordingly, a party violates the standard set forth in Sewell only if its campaign propaganda constitutes an inflammatory appeal to racial or ethnic sentiment. Otherwise, the propaganda is unobjectionable under the permissive Midland standard."If . . . racial or sexual remarks . . . do not form the core or theme of the campaign . . . and if the remarks are not inflammatory, they should be reviewed [only] under the standards applied to other types of misrepresentation." State Bank of India v. NLRB, 808 F.2d 526, 541 (7th Cir. 1986) (alterations in original) (quoting Peerless of Am., Inc. v. NLRB, 576 F.2d 119, 125 (7th Cir. 1978)). See also KI(USA) Corp. v. NLRB , 35 F.3d 256, 260 (6th Cir. 1994) (noting that the truthfulness and relevance of campaign propaganda is at issue only after the petitioning party "establishes a prima facie case that an election was unfair due to an `inflammatory appeal' to racial feelings"); NLRB v. Utell Int'l, Inc., 750 F.2d 177, 179 (2d Cir. 1984) ("We also agree with the other circuits that have passed on the issue that the Sewell test for truth and relevancy does not apply here but rather is applicable only to inflam-

8

matory racial appeals. In this view, false but non-inflammatory state-ments are reviewed according to the usual test for misrepresenta-tions."); NLRB v. Bancroft Mfg. Co., Inc., 516 F.2d 436, 442 (5th Cir. 1975) (holding that if propaganda is "racially inflammatory," then "the test for truth and relevancy must be made as Sewell describes;" if the propaganda is not inflammatory, then "the statements should be reviewed under the familiar standards applied to any other type of alleged material misrepresentation").

Thus, the truth or falsity of the Amish flier may be put aside because, as the Board found, "the materials distributed by the [Union] did not constitute an inflammatory appeal to race or ethnicity." J.A. 347 n.1. The flier merely claims that the Amish workers at Case Farms' Ohio plant were fired and replaced with Latino workers. It does not claim that the Amish were fired because Case Farms was prejudiced against the Amish; instead, it explicitly states that the Amish were fired because Case Farms "could pay Latinos less and treat them worse." The flier then asks, "How are we going to prevent Case Farms from treating us like the Amish?" It answers, "If We Want Case Farms to Treat Us with Dignity and Respect Then We Must Unite for Change -- Vote Union YES." J.A. 304. The flier makes no claim that Case Farms is bigoted or prejudiced against the Amish, nor does it attempt to "inflame" the employees against another racial or ethnic group.

The statements in the Amish flier are quite different from the appeals held to be inflammatory in other cases. The majority of those cases involve appeals to the racial or ethnic prejudices of the workers themselves, often in the form of slurs or insults. See, e.g., M & M Supermarkets, Inc. v. NLRB, 818 F.2d 1567, 1569 (11th Cir. 1987) (employee referred to owners as "damn Jews" and said "[u]s Blacks were out in the cotton field while they, the damned Jews, took their money from the poor hardworking people"); NLRB v. Eurodrive, Inc., 724 F.2d 556, 557 (6th Cir. 1984) (union organizer said that the white employees needed the union to protect their jobs because they were not protected by equal opportunity laws; he also promised that a white employee fired for racial harassment of a black co-worker would be rehired if the union won); NLRB v. Katz, 701 F.2d 703, 705 (7th Cir. 1983) (at a union rally a priest said the owners"are Jewish and they're getting rich while we're getting poor," and "why should we

9

make them rich because Jewish people are rich and we are poor and killing ourselves for them;" an employee also alleged that "the Jews marched in Skokie to keep the Blacks out"); NLRB v. Silverman's Men's Wear, Inc., 656 F.2d 53, 55 (3d Cir. 1981) (union representative called a company vice president a "stingy Jew" at an employee meeting); YKK (U.S.A.), Inc., 269 N.L.R.B. 82, 84 (1984) (repeated references to management as "Japs" and statements such as "we beat the Japs after Pearl Harbor and we can beat them again"). Cf. NLRB v. Sumter Plywood Corp., 535 F.2d 917, 924-25 (5th Cir. 1976) (finding that "the major concern" for the Sewell line of cases "is that workers of one race not be persuaded to vote for or against a Union on the basis of invidious prejudices they might have against individuals of another race"). Attempts to portray an employer as bigoted have also been found to be inflammatory in certain extreme cases. See Carrington South Health Care Ctr., Inc. v. NLRB, 76 F.3d 802, 807 (6th Cir. 1996) (cartoons in a union flier "use[d] obvious images of bondage or violence visited upon racial minorities by a white majority: a white man purchases a group of black . . . workers; a group of workers labor as beasts of burden, pulling their superiors in a wagon while being whipped; a black worker is to be summarily executed by a white overlord"); KI (USA) Corp. v. NLRB , 35 F.3d 256, 257 n.1 (6th Cir. 1994) (union flier reproduced comments of a Japanese businessman calling American workers "lazy," "uneducated," and "half-witted;" flier implied that businessman's views reflected those of the Japanese management); Zartic, Inc., 315 N.L.R.B. 495, 496 (1994) (union falsely accused employer of giving money to the Ku Klux Klan). The Amish flier fits into neither of these categories: it makes no appeal to racial prejudice, and it does not accuse Case Farms of bigotry. The Amish flier cannot be considered inflammatory.

Case Farms tries several approaches to elude this somewhat obvious result, none of which are successful. It attempts to construe the Amish flier as saying that "[t]he laws of the United States did not prevent Case Farms from successfully engaging in the industrial equivalent of `ethnic cleansing' of a religious sect in Ohio" and that "[a]bsent Union protection, Case Farms will engage in a similar purge of Hispanics in North Carolina." Brief for Petitioner at 22. This reading, however, differs wildly from the plain meaning of the flier itself. There is no allegation in the flier that the Amish were fired as part

10

of some program of "ethnic cleansing."**2** As we noted above, the flier explicitly states that the Amish were fired because Latinos could be paid less and treated worse. Moreover, Case Farms cannot explain why the firing of Amish workers and their replacement with Latinos would incite fear of "ethnic cleansing" amongst a group of Latinos.

If there is any "ethnic" content to the flier at all, it is at most an appeal to Latinos in North Carolina to avoid the fate of Latinos in Ohio, namely, being paid less and treated worse. Case Farms makes no claim that such an appeal would violate the Sewell standard, nor could it. Both the Board and the courts have upheld more direct appeals to ethnic solidarity. In State Bank of India, for example, a union letter to employees claimed that the bank"is trying to keep depressed conditions and low wages for its employees, because most of you are of Indian nationality and other minority groups." State Bank of India, 808 F.2d at 541. The court found that this appeal was not inflammatory because it "urges the employees to vote for the union not by appealing to and arousing their racial prejudice, but rather by contending that the Bank itself was taking advantage of their inability to protect their own interest because of their minority status." Id. Similarly, in Bancroft a union organizer warned black employees that "if the blacks did not stay together as a group and the Union lost the election, all the blacks would be fired." Bancroft, 516 F.2d at 440. The Fifth Circuit found this accusation to be untrue because there was "no evidence that the Company intended to or did in fact treat its black employees unfairly." Id. at 442. Nevertheless, the court upheld the election results because "none of the disputed statements could be characterized as racially inflammatory." Id. at 443. See also NLRB v. Herbert Halperin Distrib. Corp., 826 F.2d 287, 289, 293 (4th Cir. 1987) (union supporters' remarks, such as "the white guys should get together and help the black guys" and "those goddamn white boys -- they're gonna vote no with [the employer], they won't support the blacks," did not "suggest an atmosphere inflamed by racial tension nor do they represent a deliberate attempt by the union to divert the

_____

**2** The term "ethnic cleansing" refers to the elimination of a certain ethnic group from a country or region, accomplished by forced withdrawals or genocide. See Editorial, Ethnic Cleansing, Boston Globe, Oct. 22, 1995, 1995 WL 5959713. The hearing officer found that Case Farms' use of the term was "misplaced, misleading, and inappropriate." J.A. 330.

11

employees from legitimate issues by insinuating an irrelevant appeal to race"); Utell, 750 F.2d at 178-79 (accusations that the company and company officers were racist "were not deliberate inflammatory appeals designed to incite racial hatred"); NLRB v. Baltimore Luggage Co., 387 F.2d 744, 747 (4th Cir. 1967) (appeals by civil rights leaders linking civil rights to unionization were a "legitimate tactic" because they were "clearly not for the purpose and could not have had the effect of exacerbating racial prejudices"). Cf. Sumter, 535 F.2d at 929 ("[S]ome degree of `consciousness-raising' will be permitted in union organizing campaigns among ethnic groups which have historically been economically disadvantaged, as long as the ethnic message becomes neither the core of the campaign nor inflammatory.").

Case Farms claims that the case of Zartic, Inc. , 315 N.L.R.B. 495 (1994), "virtually mirrors" this case and therefore offers relief. Brief for Petitioner at 13. Like this case, Zartic also involved an attempt to organize poultry processing plants that had a substantial number of Latino employees. During the organizing campaign, an employee secretly taped a discussion with a management official, who claimed that another official had called the Latino employees "the closest thing to animals they could be." Id. at 495. The union obtained a copy of the tape and played it at several organizational meetings. An employee then brought up the official's remarks at a question-and-answer session held by management; the employee, however, initially attributed the remarks to the wrong official, who was present at the session and denied making them. After additional questioning and further denials, a disturbance ensued and the meeting was terminated. Sometime after this disturbance, the union distributed two leaflets relating to a strike held ten years earlier at another of the employer's processing plants. One leaflet reproduced an article about the involvement of the Ku Klux Klan in the strike; about half of the space allotted to the article contained a picture of Klansmen in a picket line. A second leaflet reproduced an article about a Latino employee at the other plant who had been mysteriously killed about the same time as the strike. At a meeting during which these leaflets were distributed, a union organizer falsely claimed that the employer had given money to the Klan. In actuality, the Klan had been picketing against the employer, and the employer had obtained an injunction limiting the Klan's activities. The organizer also claimed that the Klan had killed the Latino employee; there had been rumors to this effect but no

12

definitive proof. Based on these events, the Board found that the union's representation campaign "constituted a sustained appeal to the ethnic sensibilities of the Employer's Hispanic employees which was inflammatory, gratuitous, and irrelevant to any bona fide campaign issue." Id. at 498. The Board therefore refused to certify the union's election victory and directed that a new election be held.

According to Case Farms, the Union campaign failed to meet the standards for propaganda set forth in Zartic. First, Case Farms claims that the Union's use of Jesyka Martinez's alleged derogatory comments about Guatemalans (they were "lazy bums," etc.) parallels the use of the management official's comments about Latinos in Zartic. Second, it claims that the Amish flier is similar to the fliers used in Zartic. The circumstances in Zartic, however, are quite different than the circumstances in this case. First, the derogatory statements were used in different ways in the two cases. The union in Zartic repeatedly and deliberately used the official's statements to inflame ethnic sentiment. See Zartic, 315 N.L.R.B. at 496 ("[I]t is clear on this record . . . that the Union used the tape repeatedly as an organizing tool in the weeks immediately preceding the election."). In this case, however, the union organizers (in quoting Martinez) were responding to a spontaneous encounter with an employee. There is no evidence that the organizers had planned ahead of time to take advantage of Martinez's remarks, nor did they make repeated use of the remarks. Moreover, the remarks at issue in Zartic were made by management, while in this case they were made by an employee.

The differences between the Amish flier and the fliers in Zartic are even more significant. In Zartic the union produced fliers with large pictures of the Klan, falsely linked the employer to the Klan, and linked the Klan to the murder of an employee. In this case, the Union claimed that Case Farms had fired Amish workers and replaced them with Latinos. The appeals in Zartic were designed to make the employees believe that the employer supported a bigoted and allegedly murderous organization, when in fact the employer had fought against that organization. In the Amish flier in this case, the appeal was designed to make the employees believe that one group of workers had been fired because the employer could pay another group of employees less and treat that group worse. The union's campaign in Zartic was a "sustained appeal to the ethnic sensibilities of the

13

Employer's Hispanic employees which was inflammatory, gratuitous, and irrelevant to any bona fide campaign issue." Id. at 498. The Amish flier cannot be considered such an appeal. **3**

As the Board recognized in Sewell, the ultimate question concerning representation campaigns is whether a party has "created conditions which made impossible a reasoned choice of a bargaining representative." Sewell, 138 N.L.R.B. at 70. Although there is evidence that a claim made in the Amish flier was a misrepresentation, the Board has recognized that employees are "mature individuals who are capable of recognizing campaign propaganda for what it is and discounting it." Midland, 263 N.L.R.B. at 132 (quoting Shopping Kart, 228 N.L.R.B. at 1313); cf. Herbert Halperin, 826 F.2d at 292 ("[W]e think that it is unrealistic to expect every election dialogue to be completely sanitized."). The Union's organizing campaign was based on the issues that first caused employee unrest at the Morganton plant: wages and working conditions. The fliers distributed by the union in support of its campaign reflect these concerns. See, e.g., J.A. 309-10 (stating that every worker brings in $20,000 in profit to Case Farms and arguing that Case Farms can afford to treat its workers better); J.A. 314-15 (describing worker mistreatment and advocating change); J.A. 319-20 (describing the benefits that union dues provide); J.A. 321 (comparing wages and working conditions between Case Farms and other poultry processors); J.A. 322-23 (arguing that the union would make real changes in working conditions); J.A. 325 ("It is only with the union that we can protect the rights for which we have sacrificed and fought through work stoppages and arrests."). The Amish flier was not an inflammatory appeal to ethnic sentiment. It instead argued for employee solidarity to prevent job loss and mistreatment. That is a legitimate area for discussion in an organization

_____

**3** Case Farms also claims that Zartic represents a departure from the Sewell standard. According to Case Farms, the Sewell line of cases only concern appeals to racial prejudice, while Zartic created a new prohibition against appeals to ethnic fear. See Reply Brief for Petitioner at 6-7. It is clear from the Zartic opinion, however, that the Board relied on Sewell for its analysis. See Zartic, 315 N.L.R.B. at 497 (citing Sewell as the "seminal case for analysis"); id. at 498 (stating that the leaflets and the union organizer's contemporaneous comments "pushed the organizing campaign past the limits which Sewell permits").

14

campaign. See Coca-Cola/Dr. Pepper Bottling Co. , 273 N.L.R.B. 444, 445 (1984) ("The question of whether employees have been unfairly treated, for whatever reason, is always a legitimate topic of discussion in a union campaign."). We conclude that the Board was well within its discretion in denying Case Farms' objection concerning the Amish flier.

III.

Case Farms also asserts that the Board erred in overruling its final objection, which stated that the "cumulative effect of the Union's misconduct" described in its first six objections deprived the employees of an uncoerced choice. Brief for Petitioner at 43. Along with the objection about the Amish flier, Case Farms' five other objections alleged Union misconduct such as a threat to call the Immigration and Naturalization Service as well as other intimidation tactics. The hearing officer examined the evidence of this alleged misconduct and recommended that all the objections be overruled. The Board agreed. Case Farms does not now appear to contend that the Board reached the wrong result on the five other objections, but rather the company claims that the hearing officer failed to examine the cumulative effects of the objections. However, the officer clearly stated that "[b]ased on the foregoing, and the record as a whole, I find that the Union did not destroy the laboratory conditions for an election by a combination of the above discussed events or by any additional acts of misconduct." J.A. 343. Since her extensive analysis of the individual objections demonstrated that they were without merit, there is no reason to conclude that they compel a different result when considered as a whole.

IV.

We conclude that Case Farms presents no grounds for overturning the results of the July 12, 1995, representation election. We therefore deny Case Farms' petition for review and grant the Board's application for enforcement.

PETITION DENIED AND ORDER ENFORCED

15

WILLIAMS, Circuit Judge, concurring:

I agree with the Majority's conclusion that the Amish flier did not constitute an inflammatory appeal to race or ethnicity. See Majority Op. at 8-9. Because the Amish flier passes muster under the permissive standard that this Court has adopted for misrepresentations, I also agree that the Board's order must be enforced. See Majority Op. at 15. I write separately, however, to express my concern with the Board's apparent disregard for the decisions of the Circuit Courts.

In its order, the Board specifically adopted the findings made by the hearing officer (J.A. at 346-47), which included a finding that "[t]he current case is . . . on point with KI (USA) Corp., 309 N.L.R.B. 1063 (1992)" (J.A. at 339). Interestingly, the Sixth Circuit, using the identical analysis employed by the Majority, denied enforcement of the Board's order in KI (USA) Corp., 309 N.L.R.B. 1063 (1992), because it found that the Union improperly appealed to racial prejudice during its election campaign. See KI (USA) Corp. v. NLRB, 35 F.3d 256, 259-60 (6th Cir. 1994). Presumably, the Board continues to believe that its order in KI (USA) Corp., and not the subsequent decision of the Sixth Circuit, is correct because it nevertheless concluded that the Amish flier "did not constitute an inflammatory appeal to race or ethnicity" (J.A. at 347 n.1).

I realize, of course, that outside the Sixth Circuit the Board is free to argue that its decision in KI (USA) Corp., 309 N.L.R.B. 1063 (1992), was correctly decided. The Board is not free, however, to automatically assume that its decisions, whether enforced or not, are the law in this Circuit. See, e.g., Industrial Turnaround Corp. v. NLRB, 115 F.3d 248, 254 (4th Cir. 1997) (noting that NLRB erred in assuming that its decision in Deklewa was the law in our Circuit); United States Dep't of Energy v. FLRA, 106 F.3d 1158, 1165 (4th Cir. 1997) (Luttig, J., concurring) (reproving the FLRA for refusing to follow our Circuit's precedent). Because the hearing officer relied almost exclusively upon an unenforced order, and because neither the hearing officer nor the Board cited one decision by this Court, I cannot help but question what the Board considers binding in this Circuit. In any event, I believe that the facts in the current case are distinguishable from the facts in KI (USA) Corp., 309 N.L.R.B. 1063 (1992). If the facts were "on point," as found by the hearing officer

16

and adopted by the Board, I would deny enforcement of the Board's order for the same reason the Sixth Circuit declined to enforce the Board's order in KI (USA) Corp. v. NLRB, 35 F.3d 256, 259-60 (6th Cir. 1994).

17